**ATLANTIC COAST LINE R. CO. et al. v. BOSTON & M. R. CO. et al.**

No. 4128.

District Court, D. Massachusetts.

March 29, 1937.

Putnam, Bell, Dutch & Santry, Arthur J. Santry, and Richard Bancroft, all of Boston, Mass., for plaintiff.

Richard W. Hall, Roscoe Cross, and William A. Cole, all of Boston, Mass., and John B. L'Engle, and Robert H. Anderson, both of Jacksonville, Fla., for defendants Wm. R. Kenan, Jr., and Scott M. Loftin, receivers of Florida East Coast Ry. Co.

Russell L. Frink, of Jacksonville, Fla., and Harold E. Stevens, of Boston, Mass., for defendant Florida East Coast Ry. Co.

McLELLAN, District Judge.

This bill in equity, brought by the Atlantic Coast Line Railroad Company and the Southern Railway Company against the Boston & Maine Railroad Company, seeks an accounting of certain sums alleged to have been collected by the Boston & Maine for the account of the plaintiffs as their share of the freight on shipments of citrus fruit from Florida to points on the Boston & Maine Railroad during a period from November 9, 1928, until November 22, 1930. The defendant, the Florida East Coast Railway Company, and its receivers, although joined as parties defendant, have filed a counter-

claim, setting forth a cause of action against the Boston & Maine similar to that set up by the plaintiffs, and hence may be treated as plaintiffs.

Motions to dismiss the bill of complaint and the counterclaim have been overruled in this court, and the case has now been heard on the merits. At the time of the hearing, substantial amendments to the bill of complaint were permitted.

Throughout this opinion, statements of fact may be taken as findings of fact, and statements of law may be taken as conclusions of law, in accordance with the Equity Rules (rule 70½, 28 U.S.C.A. following section 723).

The plaintiffs Atlantic Coast Line Railroad Company and Southern Railway Company are corporations existing under the laws of the state of Virginia, with principal offices located in the cities of Petersburg, Va., and Richmond, Va., respectively.

The defendant Boston & Maine Railroad Company is a corporation existing under the laws of the commonwealth of Massachusetts, with its principal place of business in the city of Boston, Mass.

The defendant Florida East Coast Railway Company is a corporation existing under the laws of the state of Florida, with its principal place of business in the city of St. Augustine, Fla., and the defendants William R. Kenan, Jr., and Scott M. Loftin are receivers of the East Coast Railway Company, acting as such under orders of the District Court for the Southern District of Florida.

A brief consideration of the prior history of rates and divisions applicable to the citrus fruit traffic from Florida to points in the northeastern part of the country will serve to show the manner in which the present dispute arose. Prior to 1908, rates for this traffic were fixed by agreement among the carriers concerned. They were made up by adding a charge for gathering the fruit and bringing it to one of the so-called base points in Northern Florida, together with a charge from these base points to points of junction with the northern roads, known as gateways, in this case either Richmond, Va., or Potomac Yards, Va., to which was added whatever was charged by the northern roads for carrying the fruit to its destination. Under this agreement, the rates were divided in the same way they were made up, the northern roads retaining as their share the amounts charged from the gateways to the various places where the fruit was delivered.

In 1908, as a result of proceedings before the Interstate Commerce Commission, known as Florida Fruit & Vegetable Shippers' Protective Association v. Atlantic Coast Line Railroad Company (No. 1168) 14 I.C.C. 476, the commission found that while the gathering charges were reasonable, rates north of the base points were unreasonable. The commission, therefore, specified a schedule of maximum rates north of the base points somewhat lower than those previously in force. The carriers then agreed to decrease their divisions north and south of the gateways in proportion to the decrease in rates north of the base points.

Within the next few years, the commission made some reductions in the gathering charges also. These were absorbed entirely by the southern carriers.

Between 1908 and 1928, there were no other orders of the commission dealing specifically with rates on citrus fruit. There were, however, during this period, three general changes in rates applicable to this traffic. In 1918, all rates were raised 25 per cent. by order of the Director General. In 1920, all rates for interterritorial hauls, such as are here involved, were raised 33⅓ per cent. by order of the commission. In 1922, rates were voluntarily reduced 10 per cent. by agreement among the carriers. This reduction was made permanent by order of the commission. Upon each of these occasions, the carriers involved agreed to divide the new rates north and south of the gateways proportionally to the old divisions. That is, the division of each group of carriers was increased or decreased in proportion to the increase or decrease in the rate. The divisions of the northern carriers during this period were known as the northern specifics.

During the period from 1908 until 1928, rates were published in terms of standard crates, stated to contain an estimated weight of 80 pounds. Actually, the standard crate, when full, was known to weigh on an average more nearly 90 pounds, being slightly less than that figure for grapefruit and slightly more for oranges.

On November 9, 1928, the Interstate Commerce Commission, in Railroad Commissioners of State of Florida v. Aberdeen & R. R. Co. et al. (No. 16939) 144 I.C.C. 603, put into effect a new schedule of joint rates applicable to the citrus fruit traffic. These rates were stated in specified amounts per hundred pounds, and covered the entire haul from shipper to market. The new rates were on the whole lower.

As soon as the new rates had gone into effect, the various carriers concerned entered into negotiations with respect to divisions. On November 17, 1928, the Auditor of Freight Receipts of the Atlantic Coast Line wrote on behalf of his road: "I would like also to direct your attention to the fact that I have been authorized by our Freight Traffic Department to accept tentatively settlements on basis of a revenue prorate, using rates and divisions in effect November 8, 1928 as factors." In reply to this letter, a representative of the Boston & Maine replied under date of November 27, 1928, "I have been advised by the Traffic Department of the Boston & Maine Railroad in connection with this matter, and I have arranged effective November 9, that settlement be made with your company and all other interested carriers on basis of revenue prorate, using rates and divisions in effect November 8, 1928, as factors." This letter was duly acknowledged by the Atlantic Coast Line on December 6, 1928.

The correspondence between the Boston & Maine Railroad and the Florida East Coast Railway, so far as material, follows: On January 28, 1929, the Boston & Maine Railroad wrote, "Referring to my letter of November 27 in connection with I.C.C. Docket No. 16939, I cannot find that I have been advised by you in connection with this matter. I have, however, received confirmation of my letter from both the Atlantic Coast Line Railroad Company and the Seaboard Air Line Railway Company." In acknowledging this letter, a representative of the Florida East Coast Railway replied:

"I am unable to locate having received your letter of November 27th, referred to; however, I understand that it is in connection with the divisions to be used in connection with revised rates in the above named docket.

"For your information, our Mr. H. E. C. Hawkins, General Freight Agent, has instructed me to apply as a temporary basis to remain effective until permanent divisions can be arranged that such rates divide on a basis of a revenue prorate using rates and divisions as of November 8th as factors."

No correspondence between the Boston & Maine Railroad and the Southern Railway was introduced in evidence. The following has been stipulated by the parties, however, subject to the right of any party to object to its relevancy or admissibility; and I find that:

"The plaintiff A. C. L. R. R. Co., arranged with the defendant B. & M. R. R. as set out in the correspondence attached hereto, that the new rates should be divided on the basis of a revenue prorate, i. e., the rates should be divided at such gateways as Richmond, Virginia, Potomac Yard, Virginia and Hagerstown, Maryland proportionately as the joint rates existing prior to November 9, 1928 had been divided. This arrangement was accepted and acted upon by the A. C. L. R. R. Co. and the B. & M. R. R. and by the other Plaintiffs.

"3a. Beginning with December, 1928, the Defendant B. & M. R. R. sent to the plaintiffs a statement showing the amounts which it conceded or contended to be due the Plaintiffs on said revenue prorate basis out of the freight charges collected by the delivering carrier on shipments of citrus fruits in carload lots delivered by the Defendant B. & M. R. R. in the preceding month out of the new and one factor through joint rates prescribed by the Interstate Commerce Commission. The Defendant B. & M. R. R. continued to divide the through joint rates between the northern and eastern and southern carriers respectively, on basis of a revenue prorate as aforesaid until and including shipments moving during the month of September, 1929. This basis of division was accepted by the plaintiffs."

Beginning with October 1, 1929, the Boston & Maine, without the consent of the plaintiffs or of the Interstate Commerce Commission abandoned this practice, and began to make divisions on the basis of the old specifics in force before the change of rates, increased 25 per cent. The latter figure was chosen on the theory that this constituted a conversion from a rate expressed in terms of 80-pound crates to one expressed in terms of 100 pounds. This method of making divisions, which

had apparently been adopted by the other northern carriers immediately after the new rates went into effect, see Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209, thus took no account of the new rates, which were in most cases lower, but instead actually increased the amount the northern roads received per box for their services. Furthermore, since the old specific to Boston, Mass., happened to be much lower than that to other New England points because of water competition, the Boston & Maine decided to make divisions on traffic to Boston not on the basis of the old specific to Boston, but on the basis of the specifics applicable to points inland. Being in the strategic position of making more deliveries of traffic from the southern roads than the latter were making of traffic shipped on the Boston & Maine, the latter simply kept these additional amounts. In addition, by the same process, they recaptured the difference between their new method of computing divisions, and the divisions actually made with the southern roads for the period from November 9, 1928, to October 1, 1929.

As these divisions were not satisfactory to the southern roads, the Atlantic Coast Line and other southern carriers on November 22, 1930, filed a complaint with the Interstate Commerce Commission. Subsequently, after hearings, the commission made an order prescribing divisions for the citrus fruit traffic. These divisions represented a compromise between the position taken by each side, but were on the whole more favorable to the southern carriers. This order was attacked before a three-judge court and was sustained in Baltimore & Ohio R. Co. v. United States (D.C.) 9 F.Supp. 181, and the decree sustaining the commission's order was affirmed in Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209.

Under the provisions of the Interstate Commerce Act, as amended in 1920, the jurisdiction of the Interstate Commerce Commission to award readjustment of past divisions in cases such as this extends back only to the time when the complaint was filed, or the investigation begun. United States Code, title 49, § 15 (6), 49 U.S.C.A. § 15 (6). The present suit is thus brought to require the Boston & Maine to account for amounts alleged to be due for the period between November 9, 1928, when the dispute first arose, and November 22, 1930, when the matter was first brought before the commission.

In view of the amendment of the pleadings in this case since the decision on the motion to dismiss, and the subsequent decision of the Circuit Court of Appeals for the Second Circuit in a similar case, the nature of the plaintiff's cause of action as it now appears may be stated.

The Interstate Commerce Act provides: "It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates, fares, and charges applicable thereto, and to provide reasonable facilities for operating through routes and to make reasonable rules and regulations with respect to the operation of through routes, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof as between the carriers subject to this chapter participating therein which shall not unduly prefer or prejudice any of such participating carriers." United States Code, title 49, § 1 (4), 49 U.S.C.A. § 1 (4).

In order to enforce the obligations created by the above section, the Interstate Commerce Commission is given the power either upon complaint, or upon its own initiative, to estabish through routes, and joint rates, and to fix the divisions thereof. United States Code, title 49, § 15 (3), 49 U.S.C.A. § 15 (3).

As to divisions, section 15 (6) provides: "Whenever, after full hearing upon complaint or upon its own initiative, the commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be

received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would· have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith."

■ Despite the fact that the Interstate Commerce Act provides that existing remedies either at common law or by statute are preserved (United States Code, title 49, § 22, 49 U.S.C.A. § 22), it has always been held that the right of a shipper to demand an accounting from a carrier on grounds that the carrier's charges were unreasonable can no longer be exercised until there has been a preliminary resort to the . Interstate Commerce Commission to determine whether or not the charges in question were unreasonable. Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Robinson v. Baltimore & Ohio R. Co., 222 U. S. 506, 32 S.Ct. 114, 56 L.Ed. 288. Any attempt by the courts to determine independently the administrative question would thwart the purposes of the act, and hence is not preserved by section 22.

■ The same considerations apply when it is sought to be established that the divisions made by a collecting carrier are unreasonable. In Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943, the Supreme Court points to those factors which· determine whether a preliminary resort to the commission is required. The court said, 259 U.S. 285, at page 291, 42 S.Ct. 477, 479, 66 L.Ed. 943: "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted, question and . the nature of the

enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the· exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensible."

In Terminal Railroad Association v. United States, 266 U.S. 17, 45 S.Ct. 5, 8, 69 L.Ed. 150, in holding certain railroads not guilty of contempt of a former decree alleged to deal with divisions, the court said: "It is well settled as a general rule that the question of the reasonableness of rates or of divisions of joint rates will not be considered by the courts before application has been made to the Commission."

In Atlantic Coast Line R. Co. v. Delaware & Hudson R. Corp. (C.C.A.2) 86 F.(2d) 721, 724, the present plaintiff brought suit against another northern carrier, seeking, however, in that case merely to require an accounting for the period from November 9, 1928, to November 22, 1930, on the grounds that the divisions made by the northern carrier were unreasonable. The court held that no recovery could be had upon such grounds prior to a determination by the commission of the question whether the divisions were reasonable. This decision is here followed, in spite of authorities to the contrary. See Atlantic Coast Line R. Co. v. Baltimore & Ohio R. Co. (D.C.) 12 F. Supp. 711; Atlantic Coast Line R. Co. v. Pennsylvania R. Co. (D.C.) 12 F.Supp. 720.

■ If it be urged that the statute gives no power to the commission to determine the reasonableness of divisions prior to the filing of a complaint, and hence that this power remains in the courts, it is noteworthy that prior to the act of 1920, the commission had power, in the case of ' joint rates established by its order, to

make a supplemental order prescribing just divisions of the rates, to take effect as a part of the original order. Hence when the present limitation was introduced in the Transportation Act of 1920 (49 U.S.C.A. § 15 (6), it may be inferred that it was the intention of Congress to avoid hardships which had existed under the act as it formerly stood, and to force carriers seeking readjustment of past divisions to act promptly. See Brimstone R. & Canal Co. v. United States, 276 U. S. 104, °123, 48 S.Ct. 282, 72 L.Ed. 487. See, also, Atlantic Coast Line R. Co. v. Delaware & Hudson R. Corp., supra, where the court said: "It is not enough to say that, because of established principles of equity and common law, a reasonable share of the proceeds of the transportation was due the appellants for the services performed. The remedy conferred by the Interstate Commerce Act and the one by which the appellants' rights are governed defined the procedure by which justice could be obtained. If negotiations under section 1 (4) were fruitless, a complete remedy was available. If the appellants had seasonably applied to the Commission on or before November 9, 1928, when the new rates became effective, the Commission would have had full jurisdiction and could have awarded relief as to all freight divisions which would include the claims in the present suit. Relief was impossible because of failure to comply with the statutory requirement as to filing a complaint."

In the present case, however, a different situation applicable to a portion only of the alleged causes of action is presented. When the new rates went into effect in 1928, the Boston & Maine at first agreed to make divisions on the basis of a revenue prorate, and did so make divisions until October 1, 1929. While these agreements were doubtless not of a permanent character, they all preclude the carrier which has made payments thereunder from recapturing them out of other moneys concededly belonging to another party to the agreements. Where the parties have agreed to a division of joint rates, the power of a court to enforce that agreement may not be denied. The only limitation upon the right of the parties to contract as to divisions is the obligation imposed by the Interstate Commerce Act, § 1 (4), quoted above, to agree upon reasonable divisions. In the absence of a decision by the commission that an agreement is unreasonable, it is binding.

In Alton R. Co. v. United States, 287 U.S. 229, 53 S.Ct. 124, 126, 77 L.Ed. 275, the Alton Railroad Company maintained lines from Peoria, Ill., to Chicago, and other points in Illinois, where their lines connected with those of other carriers to the east. The Alton and other carriers voluntarily established a schedule of joint rates for grain from Peoria to Buffalo and points east. These rates were divided by agreement until 1929, when the eastern carriers, without the sanction of either the commission or the Alton, arbitrarily reduced the divisions of the Alton. The Alton thereupon filed a complaint with the commission, which declined to make an order on the theory that the services of the Alton, while underpaid, were of no public importance. A three-judge court refused to review this decision, on the ground that it was a negative order. This decision was reversed in the Supreme Court, on the ground that as the effect of the order was to take away from the Alton the right it otherwise would have had to enforce its contractual rights in court, the order was in fact an affirmative one. The court said: "So long as the joint rates voluntarily established remain in force, each carrier is entitled as of right to the division originally agreed upon, unless a readjustment of the divisions has been made either by the parties or by the Commission pursuant to the power conferred by paragraph 6 of section 15. The connecting carriers were legally without power to reduce the divisions of the Alton over its objection. If they deemed its divisions unreasonably large, they could have invoked the power of the Commission to make a reduction. Instead of applying to the Commission to adjust the existing divisions, they resorted to force. Availing themselves of their strategic position as collectors of the freight, they withheld from the Alton a part of what was due it."

The plaintiffs and counterclaimants not having applied seasonably to the Interstate Commerce Commission for a determination of the questions involved may not recover for the alleged failure of the Boston & Maine Railroad to make fair divisions for the period ending November 22, 1930. The plaintiffs and counterclaimants are entitled to recover in full

the amounts once paid to them for the period November 9, 1928, to October 1, 1929, and thereafter recaptured. In the event the parties cannot agree upon these amounts, they will be determined by the court.

### Disposition of Defendants' Requests for Rulings.

Of the defendants' seven requests for rulings, the first, second, third, fifth, and seventh are denied, and the sixth becomes immaterial in view of the above opinion.

It is true, I think, as stated in the defendants' fourth request for ruling, that the arrangement provided in the correspondence between the parties and set forth in the opinion terminated on October 1, 1929, but, as indicated in the opinion, the arrangement was not of such a character as to warrant the Boston & Maine Railroad's recapture after that date of sums theretofore paid thereunder.