**SOUTHERN RAILWAY COMPANY et al., Plaintiffs,**

and

**The Denver & Rio Grande Western Railroad Company et al., Intervening Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Pacific Fruit Express Company, Intervening Defendant.**

Civ. A. No. 1776–73.

United States District Court, District of Columbia.

April 6, 1976.

John K. Mallory, Jr., Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for plaintiffs and movant.

Thomas E. Kauper, John H. D. Wigger, Dept. of Justice, Washington, D. C., Earl J. Silbert, U. S. Atty., Washington, D. C., for defendant United States.

Fritz Kahn, Hanford O'Hara, I.C.C., Washington, D. C., for defendant I.C.C.

David G. Macdonald, John Guandolo, Macdonald & McInerny, Washington, D. C.,

Herbert A. Waterman, Charles W. Burkett, Michael A. Smith, San Francisco, Cal., Harry Lustgarten, Jr., Omaha, Neb., for intervening defendant.

Before LEVENTHAL, Circuit Judge, JONES and GREEN, District Judges.

LEVENTHAL, Circuit Judge:

This is an action under 28 U.S.C. §§ 1336(a), 2321–2325[1] to suspend, annul, or set aside the report and order of the Interstate Commerce Commission (ICC or Commission) in *Ex Parte No. 137, Contracts for Protective Services*, 318 I.C.C. 111, decided August 27, 1962 (1962 Order).

---

[1]. These provisions of the Judicial Code read in pertinent part:

§ 1336. Interstate Commerce Commission's orders

(a) Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission.

(b) When a district court or the Court of Claims refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral.

(c) Any action brought under subsection (b) of this section shall be filed within 90 days from the date that the order of the Interstate Commerce Commission becomes final.

§ 2321. Procedure generally; process

The procedure in the district courts in actions to enforce, suspend, enjoin, annul or set aside in whole or in part any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures, shall be as provided in this chapter.

§ 2322. United States as party

All actions specified in section 2321 of this title shall be brought by or against the United States.

§ 2323. Duties of Attorney General; intervenors

The Attorney General shall represent the Government in the actions specified in section 2321 of this title and in actions under sections 20, 23, and 43 of Title 49, in the district courts, and in the Supreme Court of the United States upon appeal from the district courts.

The Interstate Commerce Commission and any party or parties in interest to the proceeding before the Commission, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party.

§ 2324. Stay of Commission's order

The pendency of an action to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall not of itself stay or suspend the operation of the order, but the court may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the action.

§ 2325. Injunction; three-judge court required

An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefore is heard and determined by a district court of three judges under section 2284 of this title.

Under the amendments enacted Jan. 2, 1975, Pub.L. 93–584, §§ 1, 5–7, 88 Stat. 1917, actions to enjoin or suspend ICC orders are now brought in the courts of appeals, with single-judge district courts retaining jurisdiction to enjoin or suspend ICC orders for the payment of money or collection of fines, etc. However, Section 10 of the 1975 amendments provides that the new procedures do not apply to actions commenced on or before the last day of first month beginning after the date of enactment, and that "actions to enjoin or suspend orders of the Interstate Commerce Commission which are pending when this Act becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced."

## I. INTRODUCTION

### A. *Parties and Contentions*

Plaintiffs are several common carriers by railroad.[2] Defendants are the Commission and the United States of America, as statutory defendant under 28 U.S.C. § 2322. Intervening defendant is the Pacific Fruit Express Company (PFE), a company engaged in the furnishing of cars containing mechanical heating and refrigeration units for the protection of perishable commodities against heat and cold. PFE is wholly owned by the Union Pacific Company and the Southern Pacific Transportation Company.

This action was filed on September 17, 1973. Various motions to dismiss of defendants and intervening defendant were denied on July 17, 1974, although the issue of the applicability of the doctrine of laches was reserved for this decision. Argument on the motions to dismiss was heard on May 27, 1975.

In the 1962 order, the Commission conditionally approved for a limited time only certain contracts for the provision of "protective services"[3] pursuant to § 1(14)(b) of the Interstate Commerce Act, 49 U.S.C. § 1(14)(b),[4] and set forth certain standards governing the filing and content of new contracts to replace these and other existing contracts and arrangements. This challenge was precipitated by a subsequent action of the Commission, not specifically under review here,[5] in *No. 35515, Contracts—Protective Service Between Pacific Fruit Express Company and the Akron, Canton and Youngstown Railroad Company, et al.,* 340 I.C.C. 754 (1972) (1972 declaratory order). There the Commission declared that under the 1962 Order connecting or terminating carriers (non-originating carriers) are being furnished "protective services" when they receive cars with mechanical refrigeration units originating elsewhere, even though the car line compa-

2. Those remaining plaintiffs in this action are the Baltimore & Ohio R.R. Co., Chesapeake & Ohio Ry. Co., Chicago, Milwaukee, St. Paul & Pacific R.R. Co., Chicago, Rock Island & Pacific R.R. Co., trustees for the Erie-Lackawanna Ry. Co., Illinois Central Gulf R.R. Co., Louisville & Nashville R.R. Co., Norfolk & Western Ry. Co., and Seaboard Coast Line R.R. Co. Orders of this court granting motions for voluntary dismissal with prejudice issued as to former plaintiffs Chicago & North Western Transp. Co. (10/8/75), Southern Ry. Co. (10/10/75), and trustees for Penn Central Transp. Co. (12/16/75), and as to former intervening plaintiffs Denver & Rio Grande Western R.R. Co. (10/10/75) and Missouri-Kansas Texas R.R. Co. ("Katy") (11/12/75).

 On December 4, 1975, Western Maryland Ry. Co. moved for leave to file second amended complaint as intervening plaintiff. Because we do not reach here the merits of Western Maryland's separate contentions, *see* note *18 infra,* we dismiss its motion without prejudice to any motion it might wish to make to participate in the proceedings on remand before the ICC.

3. Protective services are special services for the protection of perishable commodities from the elements while moving in transit. Mechanical protective services (MPS), a subcategory thereof and principally in dispute here, are defined as the protection furnished the lading by or through the operation of a mechanical unit in a car so equipped.

4. Section 1(14)(b) provides:

 It shall be unlawful for any common carrier by railroad or express company, subject to this part, to make or enter into any contract, agreement, or arrangement with any person for the furnishing to or on behalf of such carrier or express company of protective service against heat or cold to property transported or to be transported in interstate or foreign commerce, or for any such carrier or express company to continue after April 1, 1941, as a party to any such contract, agreement, or arrangement unless and until such contract, agreement, or arrangement has been submitted to and approved by the Commission as just, reasonable, and consistent with the public interest: Provided, That if the Commission is unable to make its determination with respect to any such contract, agreement, or arrangement prior to said date, it may extend it to not later than October 1, 1941.

5. All parties agree that this action is not an attack on the 1972 declaratory order. Under 28 U.S.C. § 1336(c), when a district court refers questions to the ICC for determination, that court has exclusive jurisdiction of any action to enjoin an order arising out of such referral, and such action must be brought within 90 days from the date the order becomes final. The 1972 ruling by its express terms disclaimed any application to any other proceeding than that before the referring court. *But see* text at pp. 1129–1130 & note 71 *infra.*

nies [6] providing the units are "foreign car lines" in that they perform no additional services over connecting railroads' lines, and must submit their agreements or arrangements with the car lines for approval by the Commission.

Plaintiff railroads argue: (1) This interpretation is not supported by findings and substantial evidence in the 1962 Order. (2) If the 1962 Order is so interpreted, there is no statutory authorization for it under § 1(14)(b). (3) The 1962 Order, so interpreted, is procedurally defective because of vagueness and failure to comply with the notice and comment requirements for rulemaking under the Administrative Procedure Act (APA). (4) Under this reading, the 1962 Order mandates pooling agreements illegal under § 5(1) of the Act, 49 U.S.C. § 5(1), without prior specific Commission approval. (5) The Commission's actions subsequent to 1962 in unconditionally approving contracts not containing agreements between non-originating railroads and foreign car lines for the provision of mechanical protective service (MPS) and consistently failing to clarify the scope of its 1962 Order attached an impermissible retroactive effect to the Commission's present interpretation. Defendants and intervening defendant, in addition to disputing the foregoing contentions on the merits, maintain that plaintiffs' action is barred by the doctrines of exhaustion of administrative remedies and laches.

### B. *Outline of Ruling*

This case has a protracted history, due in significant measure to the imprecision of the 1962 Order, and prolonged not only by Commission indecisiveness and inaction but by affirmative conduct creating the distinct impression that the 1962 Order did not reach the issues in dispute here. These are considerations that would render inequita-

ble any ruling rejecting the lawsuit for laches. As for the defense of exhaustion of administrative remedies, while we have been sorely tempted to remand to the ICC for clarification before undertaking any decision on the merits, we are reluctant to prolong the anxiety and confusion in this regulatory no-mans land. The lack of clarity in the 1962 Order, compounded by the Commission's subsequent actions, has hampered our consideration of the merits. After reflection, we conclude that there is authorization in the 1962 Order and § 1(14)(b) for the Commission's present interpretation, and we also decline to set aside the 1962 Order because of the procedural objections of plaintiffs. Thus, we are clear as to the legality of prospective application of the order as interpreted in 1972. However, we recognize, in light of the tortuous history of this case, that there is a problem of unfairness as well as a possible statutory barrier in § 15(6) of the Act, 49 U.S.C. § 15(6),[7] if plaintiff carriers are exposed to liability, whether through administrative or private enforcement actions, for their previous non-compliance with the 1962 Order as interpreted in 1972.[8] Since the ICC has yet to make clear that it understands the 1962 Order to impose substantive liability on plaintiff carriers in the absence of either superseding contracts approved by the Commission under § 1(14)(b) or administrative enforcement proceedings, and indeed has suggested otherwise in the 1972 interpretive ruling, we remand to the Commission to determine whether, and as of what point, plaintiffs can be held liable for their previous non-compliance. As part of the proceedings on remand, we also urge it to investigate the possibility of conducting a settlement conference among all the interested parties (which would not be limited to the formal parties in this action). Such an approach might better accommodate the interests within this troubled transportation

---

6. A car line company is one which, as owner or lessee of railroad cars, supplies them to railroads for use in transportation. Car line companies which furnish cars designed to protect lading against the elements also usually provide protective services.

7. *See* note 65 *infra* for text.

8. The deadline ultimately set by the ICC for the filing of agreements in conformance with the 1962 Order was June 10, 1963.

sector than continued litigation, and would aid judicial administration as well as uniformity of regulatory policy by terminating pending lawsuits in different courts.[9] Finally, we decline to enjoin enforcement of the 1962 Order, as to retrospective application, pending the outcome of administrative proceedings on remand.[10]

## II. BACKGROUND AND PRIOR PROCEEDINGS

In order to understand the various contentions of the parties, a somewhat detailed background is necessary.

### A. *Statutory Scheme in General*

Section 1(4) of the Act makes it the duty of every common carrier by rail to furnish transportation upon reasonable request and to establish just and reasonable rates. Section 3(4) requires every common carrier to provide facilities for the interchange of traffic. Compensation for inter-line traffic is provided by through rates with other railroads, as established by the railroads under § 1(4) or the Commission under § 15(3). 49 U.S.C. §§ 1(4), 3(4), 15(3).

As part of the railroad's duty to provide transportation service, section 1(11) requires the carrier to provide reasonably adequate and suitable "car service" for all the traffic it holds itself out to transport. And in the case of perishable commodities, the obligation extends to the provision of rail cars with protection against heat or cold.[11] The shipper or receiver of perishables pays two charges, one for transportation and one for protective service, both of which are covered by railroad tariffs filed with the Commission. In a shipment involving more than one carrier, these charges are in the form of joint tariffs.

The duty to furnish cars and protective service in the first instance is placed on the originating carrier, and the arrangements are usually made with wholly-owned subsidiaries acting as car line companies. With respect to inter-line shipments, the statutory duty to accept cars in interchange gives rise to inter-line arrangements, with transportation charges divided among participating railroads in agreed-upon shares or "divisions." Protective service charges are allocated as between the roads and the car line companies by "division sheets," in the absence of bilateral contracts between particular roads and car line companies. Rental for the use of the cars is paid by non-owning railroads to car-line companies.

The Commission regulates compensation to the car line company for the use of the car or "car service" under § 1(14)(a),[12] and

9. We had been hopeful that some settlements already made, related to us by motions for voluntary dismissal and accompanying papers, *see* note 2 *supra,* would be extended to all the parties. It now appears this result will not materialize. We therefore project the possibility that an equitable solution, and possibly a substantially agreed solution, can be achieved through our partial disposition of the lawsuit (as to prospective application) and our remand to the Commission in the manner indicated.

10. In the interest of expeditious consideration, however, we order the ICC to report to this court within 90 days on the progress of its proceedings consistent with this opinion.

11. *See* Matter of Charges for the Transportation and Refrigeration of Fruit, 11 I.C.C. 129 (1905); *Baker v. Boston & M. R. Co.,* 74 N.H. 100, 65 A. 386 (1906); Protection of Potato Shipments in Winter, 26 I.C.C. 681 (1913); Charges for Protective Service to Perishable Freight, 274 I.C.C. 751 (1949).

12. 49 U.S.C. § 1(14)(a), as amended Pub.L. 89–430, 80 Stat. 168 (May 26, 1966), provides:
 § 1, par. (14). Establishment by Commission of rules, etc., as to car service
 (a) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the

for "protective service" rendered under § 1(14)(b). Section 1(14)(a) was enacted in 1917, and amended in 1940, to make clear that it covered compensation for the use of the car "whether or not owned by another carrier." The Commission sought enactment of § 1(14)(b) in 1940 because doubts as to its jurisdiction over car line companies prevented close scrutiny of their relationship with their parent roads in determining the actual cost of providing protective service so that the Commission would have a proper basis for approving cost-related protective service tariff charges to be paid by shippers.[13]

The dispute before us turns in part on the distinction between "car service" and "protective service." When protective services involved only the use of ice or salt in refrigeration cars, the distinction enjoyed clarity. The furnishing of the car itself was the responsibility of the car line company operating in the area of the originating railroad, and this capital investment was recognized not only by the originating carrier but also by the connecting carriers in the form of rental assessments paid to the car owner, subject to the Commission's approval. But while the car line company loaded the car with ice or salt, it was necessary for successive providers of protective service to repack the car with ice as it melted in transit. Each railroad along the route provided the service in its own area. Accordingly, the Commission ruled that the car line's provision of portable coolers or heaters did not constitute protective service; the agreements going to the Commission for approval were for services rendered by car line operating personnel.[14]

With the advent of mechanical protective service units in 1953, however, the distinction blurred. The car now included a MPS unit, designed to operated without significant servicing or repairs for the entire transcontinental journey. The car line company supplies, maintains, and repairs the MPS unit and its incidental appurtenances, adds fuel and refrigerant, and generally attempts to put the unit in satisfactory condition for an entire trip, although minor repairs and resupplying of fuel or refrigerant are sometimes performed by the connecting roads for which the car line company is billed.

Since MPS did not call for such extensive services in intermediate and destination areas as had previously been performed, the railroads comprising the National Perishable Freight Committee (NPFC), a ratemaking organization of plaintiffs and other carriers responsible for promulgating a "perishable protective tariff," adopted Division Sheet 7 in 1953. The railroads agreed that in the absence of a bilateral agreement with the car line company 80% of protective service revenues would be allocated to the originating road, for payment to the car line company to cover cost of ownership and other expenses, with the remaining 20% allocated to the connecting roads in the same

---

basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Com-

mission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.

This provision was further amended in 1976 to provide additional incentives "to encourage the purchase, acquisition and efficient utilization of freight cars." Pub.L. 94–210, 90 Stat. 31, 46, § 212 (Feb. 5, 1976). These changes are not pertinent to the discussion here.

13. ICC, 45th Annual Report to the Congress 89, 121 (1931). *See, e. g.,* Charges for Protective Services to Perishable Freight, 215 I.C.C. 684 (1936); Refrigeration Charges on Fruits, etc., from the South, 151 I.C.C. 649, 693 (1929).

14. *See* text at pp. 1139–1140 & note 46 *infra.*

proportion as division of the transportation charges. Bills for fuel, refrigerant, and repairs by connecting roads would be reimbursed by the car owner.

### B. *Prior Proceedings*

(1). *1940 Order.* With the enactment of § 1(14)(b), in 1940, the Commission immediately opened the *Ex Parte No. 137* Docket, ordering, on October 18, 1940, the railroads to file copies "of all their currently operative contracts, agreements, or written arrangements" for protective service and transform unwritten understandings into written contracts. *Contracts for Protective Services* (First Report), 246 I.C.C. 145–46 (1941). The First Report, which issued on July 31, 1941, set the general approach of declaring the principles and guidelines the Commission would apply in passing on the contracts and arrangements that the carriers were required by § 1(14)(b) to file for ICC approval.[15]

(2). *1962 Order.*[16] The advent of MPS prompted the Commission, on October 28, 1959, to institute a new investigation to determine whether the charges set forth in certain MPS contracts were consistent with the public interest under § 1(14)(b) (R. 7986).[17] All railroads party to these contracts were made respondents, and notice in the Federal Register was given. The investigation was subsequently broadened, on May 20, 1959, to include charges for use of mechanical refrigeration in additional contracts; and, on December 9, 1959, to bring in as respondents "all rail carriers having contracts for protective service on file with the Commission requiring approval pursuant to Section 1(14)(b)," and to include all charges for protective service in order to determine whether prior decisions in *Ex Parte No. 137* should be modified (R. 8008). Because of the resultant scope of the proceeding, all of the plaintiff railroads were respondents,[18] and all the significant car line companies participated.[19]

Following hearings held in 1959 and 1960, the hearing examiner, on March 23, 1961, issued his recommended report and order. His pertinent conclusion was that intervening defendant PFE, although compensated for MPS by Division Sheet 7, was "operating under an arrangement with the railroads to render mechanical refrigeration services without the approval of the Commission" (R. 8022–83). And as to the contracts before him, the examiner denied approval because on the basis of the record evidence they did not cover the costs of the car line companies (R. 8032, 8037–38).

After the filing of exceptions to the examiner's report and replies thereto, and aft-

**15.** Of pertinence here, the First Report declared that (1) railroads should keep revenues from protective service tariffs and divide among themselves according to their usual agreed "division" of joint rates "in due recognition of all that is done with respect to this traffic by the initiating railroads, as compared with the intermediate and delivering carriers"; (2) car line companies should bill each railroad served on the basis of cost plus a reasonable profit; and (3) there should be separate contracts for protective service and car service. 246 I.C.C. at 155–56.

**16.** Nineteen supplemental reports precede the 1962 Order under attack here—all part of the ongoing *Ex Parte No. 137* proceeding—but are of little relevance to the instant case.

**17.** References to the record in the ICC's continuing docket in *Ex Parte No. 137* are designated "R".

**18.** The Missouri, Kansas and Texas Railroad ("Katy"), the Western Maryland, and the Santa Fe were the only significant carriers not made respondents (Tr. 39). The Santa Fe never joined the instant suit. The Katy, previously intervening plaintiff, was granted a voluntary dismissal with prejudice on November 12, 1975. And the Western Maryland sought to intervene on plaintiffs' side on December 4, 1975. Western Maryland's motion to intervene is denied, for we decline to consider whether the 1962 Order may be applied to carriers who were not formally made respondents, *see* note 59 *infra*

**19.** In addition to PFE, the other participating car lines were Fruit Growers Express (FGE), owned by nineteen eastern and southern railroads; American Refrigeration Transit Company (ART), owned by the Missouri Pacific and the Wabash; Western Fruit Express (WFE), owned by the Great Northern; Merchants Despatch Transportation Corp., owned by the New York Central; Burlington Refrigerator Express Company (BFE), owned by the Chicago, Burlington & Quincy; and M. J. Schiffer Company.

er oral argument, Division 3 of the Commission, on August 27, 1962, issued the 1962 Order challenged in this case. While leaving for later discussion the matters in dispute here, we note that the Commission (1) approved all the contracts before it on the condition that "[a]ll rail carriers and express companies receiving protective service under any contracts, agreements, or arrangements requiring approval under § 1(14)(b) . . . shall submit for approval within 120 days after the effective date of the order herein, new and superseding contracts covering protective services which shall replace all prior contracts, including division sheet 7"; and (2) required these new or superseding contracts to contain specific requirements, most notably a guarantee of cost plus reasonable profit to the car line companies. 318 I.C.C. at 125–27.

(3). *1962–65, Hiatus.* Considerable confusion attended issuance of the 1962 Order. On October 12, 1962, New York Central requested an extension of time in order to seek reconsideration (R. 10073–74), and on October 17, 1962, the Commission granted an extension to November 19, 1962, and postponed the effective date of the order to January 10, 1963 and the date of compliance to May 10, 1963 (R. 10075). The deadline for filing new contracts was again extended to June 10, 1963 at the request of Southern Pacific and Union Pacific, who noted that the railroads could not agree "on method of

payment of car line cost by intermediate and destination carriers" (R. 10088).

On March 12, 1963, after the date had expired for seeking reconsideration, the Missouri Pacific and the Wabash, owning lines of American Refrigeration Transit Company (ART), filed a "petition for leave to file a petition for clarification and/or modification," specifically raising the questions whether the 1962 Order required contracts between non-originating carriers and foreign car lines, and whether Division Sheet 7 had to be superseded, and identifying the extent of confusion among the affected parties (R. 10288, 10080–85).[20] The Commission denied the petition for failure to present "sufficient grounds" (R. 10293–94).[21]

Thereafter, in light of the June 10, 1963 deadline, contracts between railroads and six railroad-controlled car lines were filed and "unconditionally approved" by the Commission, on September 9, 1963, as in compliance with the 1962 Order.[22] 321 I.C.C. 758, 761–62. The Commission made no mention of the fact that these contracts did *not* provide for compensation from non-originating lines for the furnishing of MPS. The Commission did not refer in any way to the failure of the railroads to seek approval of their continued use of Division Sheet 7.[23]

Between 1963 and 1972, the Commission continued to approve contracts and amendments. None of these agreements applied to carriers outside of the car line's area of

**20.** The petition asserted:

Until rather recently it had been hoped that some uniform understanding (on the part of the several respondents) as to the meaning of the said report could be arrived at so as to permit effective compliance . . . [I]t has now become apparent that the differing interpretations cannot be reconciled without some clarification by your Commission.

R. 10289–90.

**21.** *See* note 64 *infra.*

**22.** Ten contracts between certain railroads and independent car lines were only conditionally approved because they did not fully comply with the 1962 guidelines.

**23.** The PFE contract with its owning roads specifically noted that PFE shall be compensated

"by other carriers for services performed for such other carriers in accordance with the provisions of Division Sheets and other contracts" (R. 17684). Southern Pacific's letter to the ICC submitting its contract with PFE explained that "[t]o implement this provision it is contemplated that the Division Sheets will be modified forthwith to provide that revenues from mechanical protective service shall be divided among all carriers participating in such service on the same basis as governs division of the joint through freight rate via the route over which the shipment moves, and that carriers participating in such a movement will share the charges of the equipment owner on the same basis" (R. 10096). The Commission did not condition approval of the PFE contract on the securing of this contemplated modification, which never materialized.

operations.[24] There was no sign of ICC disapproval.

(4). *1965–72, California Litigation and the 1972 Order.* In 1965, PFE, intervening defendant here, brought an action in the Northern District of California for damages and injunctive relief against ninety eastern and southern railroads to recover compensation for furnishing MPS units in PFE cars traversing their lines. Shortly afterwards, on February 8, 1966, Union Pacific and Southern Pacific, PFE's parent lines, petitioned the Commission for a cease and desist order directing defendants to pay their share of PFE's costs as directed by the 1962 Order, rather than allocate tariff revenue on the basis of Division Sheet 7 (R. 10552, 10557). That petition was opposed by those defendants who later became plaintiffs in the present action, and who asserted they were in full compliance with the 1962 Order. The Commission, on May 17, 1966, rejected the petition as raising the same questions as the California action (R. 10581).

Questions were certified by the District Judge in the California suit, on November 16, 1971. In response, Division 2 of the Commission issued a declaratory order, dated February 28, 1972, which by its terms applied only to the California action. In the 1972 Order, the Commission declared, in pertinent part, that (1) PFE's furnishing of a MPS unit constituted "protective service" within § 1(14)(b), as distinguished from "car service" under § 1(14)(a); (2) the 1962 Or-

der required the filing of contracts between PFE and non-originating carriers; and (3) Division Sheet 7, although not officially on file with the Commission, was "specifically embraced" by the 1962 Order, and the failure to file contracts superseding it violated § 1(14)(b) but did not render the division sheet void. 340 I.C.C. 754, 766–71.[25]

As a result of the Commission's answers, the District Judge ruled, on March 2, 1973, that the failure of the railroads to enter into new contracts superseding Division Sheet 7 violated the 1962 Order and § 1(14)(b), giving PFE a right of action for damages and injunctive relief.[26] The Court of Appeals for the Ninth Circuit affirmed on August 28, 1975, after oral argument in the case at bar on the motions to dismiss.

(5). *Post-1972 Order Developments.* The Commission's 1972 declaratory order not only influenced the outcome of the California action, but encouraged a number of other district court enforcement actions involving claims similar to those raised by PFE.[27]

On December 1, 1972, before the California district court decision issued, the owning roads of Fruit Growers Express and Western Fruit Express, including many of the plaintiff carriers here, filed a "petition for further and supplemental hearings" in *Ex Parte No. 137,* complaining of a turnabout in the Commission's position and lack of notice and opportunity to participate in the formulation of the claimed novel inter-

---

**24.** R. 10531, 10537, 10544, 10548, 10584, 10587, 10590, 10593, 10596, 10599.

**25.** For the ICC's answers to whether the 1962 Order imposed substantive liability in the absence of superseding, approved contracts or administrative enforcement proceedings, *see* text at pp. 1146–1147 & notes 72–3 *infra.*

**26.** *Pacific Fruit Express Co. v. Akron, Canton, Youngstown Railroad Co.,* 355 F.Supp. 700, 707 (N.D.Cal.1973), *aff'd,* 524 F.2d 1025 (9th Cir. 1975). The court cited 49 U.S.C. §§ 8, 9, 16(12), *see* text at pp. 1147–1149 & notes 78–9 *infra.*

**27.** These cases were all stayed pending the outcome of this decision. *Fruit Growers Ex-*

*press Co. v. Akron, Canton & Youngstown R.R., et al.,* Civ. Action No. 73–2892 (E.D.Pa., filed December 21, 1973); *Western Fruit Express Co. v. Akron, Canton & Youngstown R.R., et al.,* Civ. Action No. 73–2897 (E.D.Pa., filed December 21, 1973); the *Atchison, Topeka & Santa Fe Ry. v. Baltimore & Ohio R.R., et al.,* Civil Action No. 74–1859 (E.D.Pa., filed July 22, 1974); *American Refrigeration Transit Co. v. the Atchison, Topeka & Santa Fe Ry., et al.,* Civil No. 73 C 854 (E.D.Mo., filed December 21, 1973).

In a fifth action, a comparable claim arose as a counterclaim but was rejected by the trial court. *Chicago & North Western Transportation Co. v. Atchison, Topeka & Santa Fe Ry.,* 367 F.Supp. 801 (N.D.Ill.1973). *See* notes 49–50, 84 & accompanying text *infra.*

pretation (R. 10622–49).[28] On January 26, 1973, the Commission denied the petitions on the ground that the petitioners were merely concerned about the effect of the 1972 Order which explicitly disclaimed application to any situation except the California suit (R. 10602). Also, for a time, the Commission continued to approve contracts and amendments which did not deal with the foreign car line question (R. 10593, 10599). However, on February 1, 1974, the Commission approved several ART contracts which covered the use of ART equipment by non-originating carriers outside ART's service area (R. 10655, 10682), expressly noting

> [t]hat the superseding contracts contain the same provisions as the contracts previously in force except that the superseding contracts apply to all usages of the contractor's protective service equipment in contrast to the superseded contracts which applied to originating movements only . . . .

(R. 10655).

III. *Applicability of Doctrines of Exhaustion and Laches*

The defendants claim laches, that since plaintiffs' duty was clear under the 1962 Order—to supersede all prior protective service contracts, including Division Sheet 7, with new contracts conforming to certain criteria—plaintiff carriers have no excuse for not bringing this challenge sooner.

■ We are asked to bar this action on grounds of equity. The 1962 Order does not speak with crystal clarity. Plaintiffs' interpretation that it did not require approval of arrangements between non-originating carriers and foreign car lines was a not insubstantial one in light of the Commission's pattern of responses, particularly its September, 1963 "unconditional approval" and recurring failure to bring action against plaintiffs for violating the 1962 Order with respect to Division Sheet 7.

Defendants and intervening defendant also maintain that plaintiffs failed to file a timely petition for reconsideration of the 1962 Order,[29] and consequently cannot satisfy the jurisdictional prerequisite to judicial review in § 17(9) of the Act; [30] and, moreover, have never presented to the Commission the contentions now being urged on this court.

■ Assuming § 17(9) requires a denial of a timely petition for reconsideration before judicial review may be had of an order issued by a division of the Commission,[31] we

**28.** Petitions in support of the "petition for further and supplemental hearings" were filed by the Katy, initially an intervening plaintiff here (R. 10674), the trustees for the Erie-Lackawanna, a plaintiff here (R. 10620), and a group of midwestern carriers including the Chicago and Northwestern, initially a plaintiff here (R. 10613).

**29.** 49 U.S.C. § 17(9) provides:
 Judicial relief from decisions, etc., upon denial or other disposition of application for rehearing, etc.
 (9) When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or referred to him or it shall have been made and shall have been denied, or after rehearing, reargument, or reconsideration otherwise disposed of, by the Commission or an appellate division, a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court

of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise.

**30.** Plaintiffs initially had thirty days from date of service of the 1962 Order (September 16, 1962) but this was extended until November 19, 1962. The first petition for reconsideration was filed by the owning roads of ART on March, 14, 1963.

**31.** *See Northern Valley Transfer, Inc. v. ICC*, 192 F.Supp. 600, 606 (D.N.J.1961); *National Water Carriers Ass'n v. United States*, 126 F.Supp. 87, 90 (S.D.N.Y.1954); *Holmes v. United States*, 89 F.Supp. 894 (S.D.N.Y.1949), *aff'd*, 339 U.S. 927, 70 S.Ct. 628, 94 L.Ed. 1348 (1950). The Supreme Court in a relatively recent opinion discussing the review provisions of the Act characterized § 17(9) as "basically a provision requiring exhaustion of administrative remedies prior to resort to the courts." *ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 583 n.2, 86 S.Ct. 1000, 1006, 16 L.Ed.2d 109, 116 (1966).

find that "good cause" was shown under the Commission's rules [32] for the untimeliness of the petitions filed on March 14, 1963 and December 1, 1972, and that the Commission abused its discretion in ignoring these efforts at seeking needed clarification. As to the March, 1963 petition, the petitioning roads pointed out that while the time for seeking reconsideration had passed, actual compliance in the form of superseding contracts at that point was not required until May 10, 1963 (R. 10289), and that they needed answers to specific questions—pertaining to the very matters in dispute here—before they could effect compliance. Once the Commission gave its September, 1963 "unconditional approval" to the contracts that were submitted, without the slightest hint that the parties to Division Sheet 7 were in non-compliance for failure to supersede the sheet, plaintiffs had no reason to go to the Commission until the 1972 declaratory ruling issued. When they were alerted by the 1972 ruling, plaintiffs filed their December, 1972 petition, but this was also summarily denied.

■ Ordinarily, we would remand this case to the Commission for findings on plaintiffs' objections before undertaking judicial review. In the circumstances, this would be a futile exercise. The Commission has indicated that it has responded to these objections, and has nothing further to say or do on the matters challenged here. This is the position of counsel for the ICC and the United States. The 1972 Order announces the Commission's responses to the issues in dispute. Even though those answers were directed to parties to a particular lawsuit, the Commission made manifest its underlying approach as that time,[33] and its subsequent denial of the "petition for further and supplemental hearings" is congruent with that approach. The doctrine of exhaustion of administrative remedies is a doctrine of sound administration, but it is not fairly invoked here. And there is an interest in bringing this seemingly intermi-

nable litigation to some point of resolution. So we go to the merits.

## IV. REACH OF THE 1962 ORDER

■ The key questions are whether the 1962 Order contains adequate findings supported by substantial evidence on whether (1) the mere furnishing of a MPS unit to non-originating carriers constitutes the provision of "protective service" under § 1(14)(b), as opposed to "car service" under § 1(14)(a), and (2) Division Sheet 7 constitutes a protective service contract or arrangement that had to be superseded by conforming agreements and filed with the Commission for its approval. To consider that question simpliciter, we shall ignore for the moment the effect of subsequent actions by the Commission, and suppose the 1972 interpretation had appeared, say, early in 1963. Would we hold the 1962 Order defective? We think not. While the ICC did not deal with these matters with optimal clarity, we find the agency's path could reasonably be discerned from the text of the 1962 Order and was supported by substantial evidence.

### A. Findings

On the threshold points, the Commission distinguished between the car service operations of car line companies, which were profitable, and mechanical protective service operations, which were being run at a loss or without relation to costs, but concluded that in order to ease its supervisory function the two should be treated separately, 318 I.C.C. 111, 123–24. Also, there are numerous references to the "use" and "furnishing" of MPS units as constituting the provision of mechanical protective service. 318 I.C.C. at 114, 117, 118, 121.

The principal bone of contention is whether the ICC focused on the car line's provision of mechanical protective service to non-originating carriers. The discussion on this point is admittedly opaque, and the Commission's subsequent actions certainly

---

**32.** Rule 101(e) of the Commission's General Rules of Practice, 49 C.F.R. § 1100.101(e), requires that such petitions be filed within 30

days of the date of service of a final order, in the absence of "good cause."

**33.** See discussion at p. 1146 & note 71 *infra*.

escalated the uncertainty. But there is a discernible basis for the Commission's present interpretation.

Throughout the decision, the Commission referred to the dual basis of compensating car lines for the furnishing of mechanical protective service. The Commission found that when mechanical protective service was introduced around 1953, new items were added to the preexisting formal protective service contracts, which had contained unit prices for icing and heating, to cover the use of mechanical units and other items. 318 I.C.C. at 114. It then discussed the furnishing of mechanical protective service under the Division Sheet 7 arrangement by car lines to carriers who had not entered into unit price contracts:

In the absence of a contract providing unit prices, the tariff charges for mechanical protective services assessed the shippers are divided according to division sheet 7 . . . . It provides that 80 percent of the tariff charges are to be paid to the carrier initially handling the shipment in line-haul service to be allowed to the car owner to cover costs of ownership of the mechanical units and other expenses assumed by the car owner. The remaining 20 percent is to be divided among all railroads participating in the shipment on the same basis as that governing the division of the joint through rates over the route of movement. The division sheet is published on a national basis for the account of all carrier parties to the perishable protective tariff, which includes practically all of the railroads in the United States.

The 80–20 percent ratio is said to have been developed from conservative estimates of what the costs might be. Under the provisions of the division sheet, the car lines or others furnishing protective services assume all of the operational costs of the mechanical units such as fuel, inspection, and repairs . . . . The charges published in the perishable protective tariff vary widely according to the commodity shipped. Two carloads originating and terminating at the same stations but containing different commodities in a non-frozen state could result in revenue varying as much as 40 percent. In view of the varying revenue charges, the 80 percent thereof received by the car owner has no relation to costs. 318 I.C.C. at 144–15.

The Commission then examined the mode of compensation for each car line company separately. As to Fruit Growers' Express (FGE), plaintiffs' own car line, the Commission noted that more than half of the total frozen shipments rendered mechanical protective service were on railroads other than those with formal contracts with FGE, and FGE received compensation for these in accordance with the Division Sheet 7 arrangement.[34] As to Burlington Refrigerator Express (BRE), owned by the Burlington, and Western Fruit Express (WFE), owned by the Great Northern Railway Company, the ICC applied a cost analysis similar to that presented for FGE, although noting that BRE rented refrigerator cars and mechanical refrigeration units from its parent. As to ART, owned jointly by the Missouri Pacific and the Wabash, the ICC

---

**34.** Although total shipments are used as basis for ascertaining cost, the unit price based on such costs is applicable only to contract railroads. The 3,569 shipments of frozen commodities on contract lines added to two-thirds of the 1,716 shipments (1,144) of non-frozen commodities produces a total of 4,713 shipments made by contract railroads, to which the unit prices apply. *The remaining 4,788 (adjusted) shipments, more than 50 percent of the total shipments, were paid for under the division sheet.* The FGE does not separate cost between contract and noncontract shipments. Since, as indicated, *on shipments of perishable commodities carried*

*on railroads having no contracts with FGE for protective service, FGE receives payment in accordance with the division sheet in the same manner as other car lines which have no contracts with those railroads,* the cost basis used to determine unit prices charged to contract carriers includes the cost of shipments by noncontract lines, and the revenues received from noncontract carriers based on 80 percent of tariff charges are dependent not on the cost of service but on the type of commodity shipped and the stations involved. Thus, the unit price is not determined on ascertainable costs. 318 I.C.C. at 118–19 (emphasis supplied).

found that it had contracts with its parent lines and two other railroads, and "[i]n addition ART furnishes mechanical refrigeration services under division sheet 7." 318 I.C.C. at 121. Intervening defendant PFE was treated as a special case because it had no specific contracts with any railroad, its parent lines "regard[ing] the division sheet . . . as a unilateral contract for the furnishing of mechanical refrigeration protective services." *Id.* at 120.[35]

In its "discussion and conclusions" section, the ICC stated it was clear that none of the foregoing charges yielded the costs of rendering such services, but that it could not determine from the evidence of unit costs what unit prices in individual contracts would prove compensatory or "what changes in the provisions of the division sheet would make the car line companies whole in the performance of mechanical protective service under that sheet." 318 I.C.C. at 123. It then asked "whether such contracts, including division sheet 7, may not be approved to the extent the charges set forth therein fail to yield costs." *Id.*

The Commission's ultimate disposition was to temporarily approve the contracts before it, which did not include Division Sheet 7,[36] on condition that

[a]ll carriers and express companies receiving protective services under any con-

tracts, agreements, or arrangements requiring approval under section 1(14)(b) of the Interstate Commerce Act shall submit for approval within 120 days after the effective date of the order herein, new or superseding contracts covering protective services which shall replace all prior contracts, including division sheet 7. 318 I.C.C. at 125.[37]

While it is clear that the 1962 Order embraced the Division Sheet 7 arrangement, it is not clear whether the aspects of the sheet providing compensation to the car line company for inter-line movement of its MPS units were required to be the subject of superseding contracts. The discussion of FGE's total shipments of frozen commodities, including those over non-contract roads, and Division Sheet 7's compensation for the latter, points to an answer. Further light is shed by the testimony before the hearing examiner.

## B. *Evidence in the Record* [38]

The examiner, in his report of March 23, 1961, in response to requests by PFE's parent lines, expressly found that Division Sheet 7 constituted an arrangement between railroads participating therein and car lines for the furnishing of mechanical

---

**35.** The discussion of the Merchants Despatch Transportation and M. J. Schiffer car line companies is omitted. 318 I.C.C. at 122–23.

**36.** In temporarily approving the contracts before it, the ICC noted that "[i]n the event new or superseding contracts are not filed, further consideration will be given to the issuance of an order finding the presently unapproved contracts not within the requirements of section 1(14)(b)." 318 I.C.C. at 127.

This language does not expressly apply to Division Sheet 7, but provides some ground for plaintiffs' expectation that if their interpretation was erroneous, the Commission would enter a further order finding a violation of § 1(14)(b). *See* discussion at p. 1146 *infra*.

**37.** The Commission also set forth certain requirements for the superseding contracts. The first requirement was that the charge for protective service shall yield to the person performing the service no less than the cost of performing the service. The ICC specifically

noted that this "also applies to services performed under division sheet 7." 318 I.C.C. at 126.

The other significant requirement was that contracts provide, in substance, that

[i]n the event the person rendering the protective services shall not recover costs for any service rendered, such person shall bill the railroads and express companies receiving those services, on a proportionate basis, for the amount of the loss. In the event the profit for any service received by such person exceeds a reasonable amount, the person rendering the service shall refund the excessive amount, on a proportionate basis, to the railroads and express companies involved. Id. at 126–27.

**38.** Plaintiffs do not contest the support in the record for the Commission's conclusion that car line companies rendering mechanical protective service were not recovering their full costs of providing the service.

service.[39] This statement followed testimony by PFE witness, Mr. Chaisson, that Division Sheet 7 was an arrangement to which substantially all railroads were parties, whereby the railroads contracted to allocate 80% of the perishable protective tariff revenue to the provider of MPS units to cover its investment in the units and other services performed by it; that PFE furnished mechanical protective service not only to its parent lines and contract roads but also to all other railroads in the country who held themselves out to furnish such service to shippers through participation in the tariff; and that it was PFE's responsibility under the division sheet to pay for the fuel and repairs supplied by other railroads while the MPS unit was travelling over their lines.[40]

A number of other witnesses testified at the hearings concerning the supplying of mechanical protective service to non-originating carriers by car lines. Mr. Jamison, chairman of the National Perishable Freight Conference (NPFC), which published Division Sheet 7, testified that the railroads had agreed in 1953 that the car line company should be reimbursed for the cost of ownership of mechanical protective service equipment on each trip;[41] that the 80% allocation to car line to pay its mechanical protective service cost was "conservative" (R. 12060); and that the division sheet operates nationwide for all carriers party to the perishable protective tariff.[42] Mr. Stege, on behalf of ART and its parent lines, testified that the major part of ART's income for rendering mechanical protective service was obtained pursuant to the division sheet (R. 12079–81); and that it received 80% of the tariff revenues for furnishing and maintaining the MPS unit for the "entire route of movement."[43] Mr. Davis, vice-president and controller of FGE, BRE and WFE, testified, on cross-examination, that of 10,-000 shipments under mechanical protective service, over half were shipments on "non-contract" lines under which FGE was compensated for mechanical protective service by all railroads over which the shipment moved, whether originating, intermediate or destination railroads.[44]

**39.** There are no specific contracts between the PFE, the proprietary railroads, and the non-proprietary railroads for rates on the mechanical protective services. *The PFE receives payment for mechanical protective services from the SP and the UP, its owners, in the same manner as it does from all other railroads in the country which use PFE cars.*

The basis for the compensation to PFE for these mechanical protective service is the division sheet 7 issued by the National Perishable Freight Committee. . . .

Contrary to the provisions of Section 1(14)(b) the PFE is operating under an arrangement with the railroads to render mechanical refrigeration services without the approval of the Commission.
R. 8022–23 (emphasis supplied).

**40.** *See* R. 11968, 11983, 12007.

**41.** During meeting of that subcommittee on June 25–26, 1953, its members adopted a consensus that the car owner should be reimbursed for its cost of ownership of mechanical protective service equipment on each revenue trip and that whatever provisions might eventually be adopted should be published in the Committee Division Sheet.
R. 12060.

**42.** Q. Well, I am not asking you to comment on that particular testimony; but I am wondering whether you were in position then to see whether the division sheet actually applies nation-wide between all railroads and all car lines with respect to mechanical cars and units therein for mechanical protective service?
A. No exceptions were taken to the establishment of that divisional basis by any carriers, and the provisions published for account of all carriers parties to the Perishable Protective Tariff No. 17.
R. 12063–64. *See also* R. 12069–70.

**43.** Q. Then what is it you do under the 80 percent of the tariff revenue?

A. We furnish the mechanical refrigeration unit and maintain and operate it.

Q. For the entire route of movement?

A. Yes, sir.
R. 12091.

**44.** Q. Additionally, you had shipped in FGE cars loaded on non-contract lines, totaling 4,335 frozen commodities and 680 fresh commodities?
A. That is correct.
Q. Now, on those particular shipments aggregating approximately 5,000 cars, you did not receive revenues from the railroads on the basis of your unit prices?

Plaintiffs stress the fact that Division Sheet 7 was not formally on file with the Commission as part of the *Ex Parte No. 137* proceeding. Testimony by NPFC chairman Jamison indicates that the sheet had been physically submitted to the Commission as part of a public tariff on perishables but later, with the Commission's approval, extracted and published as a separate sheet (R. 12064, 12071). PFE witness Chaisson offered to resubmit it and specifically requested that it be filed under § 1(14)(b), but the hearing examiner felt that he could not rule "as to what is going to be filed with Commission" and simply incorporated the sheet into the record by reference (R. 11969–71).

■ Of course, these are isolated fragments of a mammoth record,[45] but they provide sufficient support for the implicit finding of the Commission that Division Sheet 7 is an arrangement requiring approval under § 1(14)(b) whereby non-originating carriers provide compensation to foreign car lines for the provision of mechanical protective service. This finding could have been more explicitly made, and the subsequent history of *Ex Parte No. 137* nurtured the seeds of confusion undoubtedly present, but we hold that the 1962 Order reaches the matters in dispute here, and that this determination was based on substantial evidence.

## V. STATUTORY AUTHORIZATION FOR THE 1962 ORDER

Plaintiffs maintain that if the 1962 Order contains adequate findings based on substantial evidence in support of the Commission's present interpretation, then the Commission acted outside of its statutory authority. Plaintiffs argue the following: (1) Section 1(14)(b) confers no power on the Commission to require the entering into of agreements, and the specific terms thereof, but simply enables it to pass on already existing voluntarily agreed contracts or arrangements. (2) An "arrangement" cannot be based on the statutory obligation of non-originating carriers to accept at interchange points cars originating elsewhere. (3) The Commission's pre-1960 rulings clearly established that "protective service" does not include the mere use of equipment but reaches only services requiring the exercise of judgment or manual exertion, *e. g.*, inspection, supervision, maintenance, accounting, etc. (4) Division Sheet 7 is an arrangement among railroads and not an arrangement between "any common carrier" and "any person" within the meaning of § 1(14)(b).

■ The history behind § 1(14)(b)'s enactment suggests that Congress sought to confer on the ICC a plenary power of supervision over the provision of protective services, and this might embrace the power to

A. No, we did not.
Q. But you received it on the basis of the 80 percent division of revenue to which reference has been made here today? Am I correct there?
A. That is correct, yes.
Q. So that of the total of $1,002,886 appearing in your Account 116 of your annual report, $544,237 represents revenues on the 4,355 cars loaded on noncontract lines?
A. Yes.

R. 12117–18.

Q. Well, conversely, where a car, an FGE car is loaded on a noncontract line and moved to destination over both noncontract and contract lines, you receive 80 percent of the tariff revenue, do you not?
A. Yes.

R. 12124.

Q. Similarly, insofar as the Western Fruit Express, and I will just give one illustration there, out of a total of 2,910 cars with an aggregate Account 116 revenue of $333,989, there were 2,437 WFE cars loaded on noncontract lines on which you received, and when I say 'you' I am referring to Western Fruit, now, received 80 percent of the tariff revenue under the division sheet?
A. Yes.
Q. And on the Burlington, out of 1,074 cars in Account 116 for dollar amount of $112,040,922, or a dollar amount of $110,890 was at the 80–20 tariff revenue split division sheet?
A. Yes.

R. 12125.

45. We note that plaintiffs' reply brief does not dispute their accuracy, other than to argue that "the record in this case . . . was not developed with notice and with knowledge that foreign car line matters were at issue." Reply Brief at 2 n.1.

compel non-originating carriers in the absence of any contract or arrangement to assume some of the foreign car line's costs in furnishing MPS units. However, there is no need to reach this question here because non-originating carriers have entered into such an arrangement in Division Sheet 7, providing for an allocation of costs and revenues between foreign car lines and connecting carriers. This is not a forced arrangement based on the duty to interchange cars, but an arrangement voluntarily negotiated to relieve the connecting carriers of a substantial part of their duty to supply protective service to the public in connection with their statutory obligation to transport perishable weight, and to give them a portion of the protective service tariff revenues as payment for additional protective service they render while the MPS unit moves over their roads.

 As to whether "protective service" can be read to include the mere provision of a mechanical refrigeration unit, designed to function over the entire route of transport without significant additional maintenance, we have no doubt that this is a permissible reading by the Commission. Earlier rulings that the furnishing of portable coolers and ice bunkers did not constitute the provision of "protective service" under § 1(14)(b) correctly read the statutory term because

46. *See, e. g.,* Ex Parte No. 137, Contracts for Protective Services, 246 I.C.C. 145, 160 (1941) ("The devices consist of portable coolers, known as 'Portakolds,' and are used for the handling of perishables therein in boxcars. The contracts provide for icing of coolers by the railroads upon which they are located. It thus appears that each railroad performs its own protective service, and the contracts in substance deal only with the furnishing of equipment, and not protective service within the scope of this proceeding.").

47. Section 1(3)(a) of the Act, 49 U.S.C. § 1(3)(a), defines "person" to include "an individual, firm, copartnership, corporation, company, association, or joint-stock association"; and separately defines "common carrier" as, *inter alia,* "all persons, natural or artificial, engaged in . . . transportation . . . ."

48. *See* text at pp. 1129–1130 & note 13 *supra.*

49. See *Chicago & N. W. Transportation Co. v. Chicago, R. I. & P. R. Co.,* 504 F.2d 453, 454–55

these devices were not essentially self-operating.[46] Developments in the technology of mechanical protective service, however, have worked a change in the application of the statutory term. Although it may be preferable, as a matter of strict economics, to combine the car line company's costs and revenues in supplying the car with those in supplying the MPS unit, the Commission is acting within its authority in treating these under the separate classifications of "car service" and "protective service."

The contention that Division Sheet 7, as an arrangement among carriers, falls outside the scope of § 1(14)(b) is somewhat troubling but on close analysis lacks merit. The Act distinguishes between "carriers" and "persons," [47] and § 1(14)(b)'s very enactment was due to the Commission's perceived lack of jurisdiction over car line companies.[48] Accordingly, several courts have held, in suits between carriers, that the provisions of Division Sheet 7 are enforceable, and no violation of § 1(14)(b) is stated, notwithstanding the failure to submit the sheet to the Commission for approval.[49]

 We note that these cases are distinguishable from the present context, which involves the right to compensation of car line companies against connecting carriers.[50] The notion underlying this dis-

(7th Cir. 1974) (suit to recover costs of re-icing refrigeration cars under terms of Division Sheet 7); *Chicago & N. W. Transp. Co. v. Soo Line R. R. Co.,* 384 F.Supp. 226, 229–30 (N.D. Ill.1974) (same); *Chicago v. Atchison, T. & S. F. Ry. Co.,* 367 F.Supp. 801, 807–08 (N.D.Ill. 1973) (counterclaim to recover for costs of providing MPS exceeding payments set by Division Sheet 7).

50. Only two of the decisions confronted the impact of PFE's California enforcement action. The 1973 decision of the Northern District of Illinois, per Judge Bauer, found the PFE suit distinguishable as "a dispute between railroads and a car-line company which is not a common carrier." 367 F.Supp. at 808 n.3. The Seventh Circuit, per Judge Castle, found that a carrier's failure to file for approval under § 1(14)(b) its bilateral contract for the supply of ice with an independent contractor did not defeat its suit against connecting carriers to recover for re-icing under the terms of Division Sheet 7, distinguishing the California action as involving a

tinction would be that carriers have no rights as against each other under § 1(14)(b), but car line companies who operate without bilateral contracts but look for compensation to the terms of an inter-carrier agreement have standing to sue if that agreement is not approved under § 1(14)(b).

■ However, to the extent these cases hold that Division Sheet 7 is outside the purview of § 1(14)(b) because it is, in the first instance, an inter-carrier agreement, they are wrongly decided. In using the term "person" in § 1(14)(b),[51] Congress broadened the Commission's authority to reach car line companies but it did not thereby withdraw its customary jurisdiction over carriers, particularly when the stated justification for regulating car lines was their symbiotic relationship, bordering that of an agency, to their parent lines.[52] If the protective service arrangement is among carriers, the ICC has jurisdiction *a fortiori.* Congress did not intend to permit evasion of § 1(14)(b) scrutiny by car lines operating without express contracts but under the terms of an inter-carrier arrangement. Its purpose in enacting § 1(14)(b), and the Commission's consistent concern both before and contemporaneous with its enactment,[53] was to ensure that the protective

service charges paid by shippers be distributed among the railroads in accordance with their respective costs in furnishing protective services through their intermediaries, the car line companies.

## VI. PROCEDURAL CONTENTIONS

### A. *Vagueness*

■ Plaintiffs level a vagueness attack on the requirements set out in the 1962 Order, particularly with respect to the Commission's failure to define terms such as "cost" and "proportionate service." We regard this line of attack premature. The 1962 requirements are permissive, in the nature of broad guidelines. Plaintiffs can provide greater specificity by negotiating superseding agreements to their satisfaction. Should the Commission disapprove those agreements, it would then have to identify the problems and provide more specific guidelines.[54]

### B. *Pooling*

■ Similarly, we dismiss as premature plaintiffs' contention that the 1962 Order is invalid under § 5(1) of the Act, 49 U.S.C. § 5(1), because compliance would require carriers and/or car lines to enter into "pooling agreements" for which Commission approval is lacking.[55] The requirement of

---

"mechanical protective service arrangement . . . between the car-line company and the carriers." 504 F.2d at 455.

**51.** The statutory definition of "person" in 49 U.S.C. § 1(3)(a) includes "corporation." Railroads in the capacity of collision victims may be regarded as "persons," *see Chicago, R. I. & P. R. Co. v. Chicago B. & Q. R. Co.,* 301 F.Supp. 72, 76 (N.D.Ill.1969), *aff'd,* 437 F.2d 6 (7th Cir.), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971). Railroads as providers of protective service may similarly be regarded as "persons."

**52.** *See* Ex Parte No. 137, Contracts for Protective Services, 246 I.C.C. 145, 154–55 (1941). This perception of the car line's relationship to its parent lines also underlies the Commission's assertion of jurisdiction under § 5(1) of the Act, 49 U.S.C. § 5(1), over an agreement between car line companies and carriers for the pooling of boxcar service and revenues, even though § 5(1) in express terms speaks only to pooling agreements among carriers. American Rail Box Car Company and Trailer Train Co., et

al.—For Approval of the Pooling of Car Service with Respect to Box Cars, Finance Dkts. 27589, 27590, 347 I.C.C. 862, 879–80.

**53.** *See* Refrigeration Charges on Fruits, etc. from the South, 151 I.C.C. 649, 692–93 (1929); Charges for Protective Service to Perishable Freight, 215 I.C.C. 684, 797–99 (1936); Ex Parte No. 137, Contracts for Protective Services, 246 I.C.C. 145, 153, 154–56 (1941).

**54.** *See American-Export Isbrandtsen Lines v. FMC,* 129 U.S.App.D.C. 1, 6, 389 F.2d 962, 967 (1968). The case relied upon by plaintiffs, *Alaska Steamship Co. v. FMC,* 344 F.2d 810 (9th Cir. 1965), involves agency failure to specify a basis for cost computation at the stage of determining the validity of particular charges, rather than the prior stage before institution of charges by the carriers.

**55.** Plaintiffs also couple this point with their vagueness argument. They maintain that because the 1962 Order compels pooling, the 1962 requirements are not permissive; discrepancies among individual contracts resulting from the vagueness of the 1962 requirements must be

§ 5(1) approval is in addition to § 1(14)(b) approval, and it is open to the Commission to exercise its authority under both provisions at the same time.[56]

### C. Compliance with the APA

Plaintiffs' argument here is twofold. First, they assert non-compliance with the APA, 5 U.S.C. § 553, on the premise that the Commission in 1962 diverted from what had been, an ongoing adjudicatory proceeding and elected to proceed by rulemaking, as evidenced by the addition of a new section to the Code of Federal Regulations embodying the requirements set down in the 1962 Order.[57] Second, whether the 1962 proceeding is denominated rulemaking or adjudication, they argue that there was simply inadequate notice of what the Commission proposed to do, since the initial notice and supplemental orders expanding the investigation referred only to contracts then on file for approval and Division Sheet 7 was never filed with the Commission under § 1(14)(b).

■ We need not consider whether the 1962 amendment of the Code of Federal Regulations constituted an election for purposes of triggering the rulemaking requirements of § 553 of the APA.[58] By virtue of the fact that they had contracts on file, all the plaintiffs were formally made respondents and participated in the Ex Parte No. 137 proceeding.[59] The absence of notice of proposed rulemaking and opportunity for public comment, if a procedural defect, was known to plaintiffs at the time, and yet at no point after the issuance of the 1962 Order did they raise this point.

■ As to the absence of notice that the proceeding would reach beyond the contracts then on file, we note that the second supplemental notice revealed the breadth of the expanded investigation, as an inquiry into "the propriety, if any, of modifying, amending or changing in any respect our approval, findings and orders in prior proceedings in Ex Parte No. 137, as they may affect the contracts or amendments thereto filed for approval" (R. 8008). Although lacking in perfect clarity, this sufficed for minimal statutory notice, that the Commission would embark on a reevaluation of all prior determinations in Ex Parte No. 137. It would be an exceedingly technical ruling to say that the Commission had disabled itself from considering divisional arrangements or contracts not then on file. Plaintiff railroads participated as formal respondents in the hearings before the examiner, where the relationship between foreign car lines and non-originating carriers and the applicability of Division Sheet 7 was explored in some depth. Plaintiffs were put on actual notice that the sheet was in issue, even if not formally filed as a contract or arrangement under § 1(14)(b), and had full opportunity to challenge its pertinence to the proceeding.

shoved into the "pool." Reply Brief of Plaintiffs at 35.

56. We note that the Commission has retroactively validated extensions of previously approved pooling agreements. Puget Sound—Portland Joint Passenger—Train Service, 169 I.C.C. 244 (1939); Pooling Passenger Train Revenues and Service, 223 I.C.C. 343 (1937).

We need not decide at this juncture whether the Commission's approval under § 5(a), 49 U.S.C. § 5(b)(5), which embodies the determination that § 5(1) approval is not required, of the Interterritorial Agreement covering the transportation of perishable freight, the implementation of which resulted in Division Sheet 7, obviates the need for further § 5(1) approval. See Railroad Interterritorial Agreement, 287 I.C.C. 701 (1953).

57. The 1962 Order resulted in an amendment of the Commission's regulations, 49 C.F.R. § 105.-2, recodified as 49 C.F.R. § 1032.2 (entitled "Content of Contracts"). The significance of this is clouded by the fact that the first report and order in Ex Parte No. 137, which issued on October 26, 1940, did not take the form of a regulation but nonetheless was also translated into a regulation, appearing at 49 C.F.R. § 105.1 (1944 cum. supp. to C.F.R. at 12195).

58. See, e. g., Texaco, Inc. v. FPC, 412 F.2d 740, 744–45 & n.10 (3d Cir. 1969).

59. We do not decide here whether the requirements of the 1962 Order may be applied to railroads who were not formally made respondents in the proceedings. See note 18 supra.

## VII. LIABILITY FOR PREVIOUS NON–COMPLIANCE

### A. *Opposing Considerations*

The foregoing is not to be taken as holding that the 1962 Order is free of ambiguity, that the Commission was under no obligation to provide clarification since its issuance, or that the Commission did not becloud matters by its subsequent actions. The ruling is only that the 1962 Order satisfied legal requirements, that it could have been applied contemporaneous with its issuance to require Division Sheet 7 to be superseded by new agreements which would be filed for approval under § 1(14)(b), and we see no legal obstacle that warrants our enjoining its prospective application.

However, we are troubled by the prospect of plaintiffs' exposure to liability for failure to file agreements superseding Division Sheet 7 by the date set by the ICC for such filings, initially 120 days after the effective date of the order, August 27, 1962, but subsequently extended to June 10, 1963.[60] The lack of clarity in the 1962 Order, standing alone, would not present a bar to liability on plaintiffs' part had the Commission during this period been more explicit and decisive on plaintiffs' obligation to supersede Division Sheet 7. Instead, the Commission compounded the confusion by denying the 1963 ART "petition for clarification and/or modification," which raised the very issues in dispute here, and soon afterwards unconditionally approving the contracts that had been submitted by the railroads toward compliance with the 1962 directive. It is not a decisive answer to say

that the Commission's role is limited to passing on contracts as they are submitted. We recognize that the Commission's responsibility for regulating a nationwide transportation network requires an internal division of its duties, and that there may be a not insignificant practical problem of coordinating the work of the unit responsible for scrutinizing agreements that are filed for approval, with that of the unit responsible for ensuring compliance on the part of agreements or arrangements not yet filed. But at some point the ICC must take affirmative steps to give effect to its order, and the combination of failure to enforce [61] after a considerable period of time and the sidestepping of opportunity for clarification has a bearing on the equity of reliance by the carriers, and of imposing liability for the period of inaction.[62] The problem is that the Commission had identified its concern with Division Sheet 7 as an integral part of handling the problem of mechanical protective service in compliance with the intent of Congress, but by its post-1962 inaction and unwillingness to provide clarification intimated that plaintiffs had satisfied the requirements of the statute and order.

The problem here is not one of retroactivity, strictly speaking, for we hold that the Commission has not established a new standard of conduct through any reinterpretation of the 1962 Order. But there is an element of unfairness in exposing parties to liability when they are confused as to what is required of them and the Commission declines to resolve doubts and indeed by inaction and some affirmative conduct suggests they are in compliance.

---

**60.** There is a question whether plaintiffs would be liable in damages to a foreign car line in a private action under §§ 8 and 9, 49 U.S.C. §§ 8–9 (for text, see note 77 *infra*), for the mere failure to make a timely filing, rather than for the failure to bargain in good faith for agreements superseding Division Sheet 7, which could occur subsequent to the Commission's deadline for filing.

**61.** Whether or not the ICC is able to bring actions in its own name to enforce its orders, *see ICC v. Southern Ry. Co.*, 380 F.Supp. 386

(M.D.Ga.1974), it surely can seek the Attorney General's aid when it believes that its order has been flouted.

**62.** This point is sharpened when account is taken of the ICC's rejection of the 1965 request of PFE's parent lines for a cease and desist order to mandate compliance with the 1962 Order. We find difficulty in accepting the pendency of the California action as a sufficient explanation for the Commission's failure to provide needed clarification, to breach what apparently had become a regulatory abyss.

Liability for past non-compliance may work considerable hardship for non-originating carriers who may have to cover the losses of foreign car lines without being able to off-set such payments either through a retroactive readjustment of the inter-line division of perishable freight rates [63] or a retroactive increase in the rates charged shippers for providing protective service for their freight. Also, changed circumstances may have ensued; the financial health of the railroads may have worsened considerably during this intervening period, and without retroactive changes in rates and divisions some carriers may become insolvent. Furthermore, while the equities do not run solely with receiving carriers,[64] there is a composite of distortions that may pile up if private and agency enforcement actions result in a myriad of outcomes.

Our difficulty with the imposition of liability for past non-compliance is heightened in the instant case because under *Brimstone Railroad and Canal Co. v. United States*, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928), the ICC is barred by § 15(6) of the Act, 49 U.S.C. § 15(6),[65] from requiring readjustments as between carriers of past receipts from past agreed rates, as opposed to readjustments of past receipts from particular joint rates which have been specifically established by the Commission after hearing.[66] Under *Brimstone*, § 15(6) gives the ICC the power to change divisions of

---

**63.** *See Brimstone Railroad and Canal Co. v. United States*, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928), and discussion at pp. 1144–1146 *infra*.

**64.** The car line companies (and their parent lines) have been suffering losses in providing mechanical protective service during this period, and at least PFE (and its parent lines), unable to obtain agreements superseding Division Sheet 7, did not sit on its rights, first petitioning the ICC in 1965 for a cease and desist order and then instituting the successful California action. And as to plaintiff carriers, there is some warrant in the record for believing that they contributed in part to their present dilemma. We note, in particular, that the 1963 "petition for clarification and/or modification," filed by the owning lines of ART, may have been construed by the Commission as a petition for reconsideration. When the ICC denied the petition, counsel wanting an answer to the issues presently in dispute would then have made clear that only clarification was sought, for which the deadline for reconsideration petitions would not have applied. There is nothing in the Commission's rules of practice barring an application for clarification when the time for seeking reconsideration has passed. Indeed, Rule 102 provides that when "the subject matter of any desired relief is not specifically covered by the rules in this part, a petition seeking such relief, and stating the reasons therefore may be served and filed." 49 C.F.R. § 1100.102. We note that the APA provides any "interested person" with the opportunity to obtain a "determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function." 5 U.S.C. § 555(b). And "[t]he agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e) (emphasis supplied).

**65.** 49 U.S.C. § 15(6) provides in relevant part: § 15, par. (6). Commission to establish just divisions of joint rates, fares, or charges; adjustments. Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. As part of the Railroad Revitalization and Regulatory Reform Act of 1976, Congress added three new subdivisions to this section providing for expeditious divisions of revenues, Pub.L. 94–210, 90 Stat. 31, 34, § 201 (Feb. 5, 1976). But § 15(6) was not altered in any manner pertinent to the discussion here.

**66.** Rates are considered agreed rates unless they are specifically set by the ICC, even though the ICC may have approved changes in

joint rates when it finds them to have been unreasonable. If the joint rates were established pursuant to an order of the ICC, then the change of divisions may be effective as of the date of the filing of the complaint or date of the ICC order of investigation.[67] But if the joint rates were not established by ICC order, then the ICC can only order a prospective change of divisions, effective as of the date of the order of adjustment.

While *Brimstone* and § 15(6) deal only with the Commission's power, *Baltimore & Ohio R. Co. v. Alabama Great Southern R. Co.,* 165 U.S.App.D.C. 226, 506 F.2d 1265 (1974), found the *Brimstone* analysis controlling on the court's equitable power to award retroactive relief from allegedly unreasonable agreed divisions, maintained during the pendency of the administrative proceeding (from the period between the initiation of the complaint and a possible award of future relief by the ICC), where the ICC is disabled from doing so by § 15(6).[68] Other courts have similarly found their power to pass on the reasonableness of past divisions foreclosed by the Commission's disability.[69]

We recognize that *Brimstone* may not expressly govern the problem under consideration. Section 15(6) is limited by its express terms to the readjustment of past receipts as between carriers, and does not deal with the rights of car lines as against carriers. Also, the Commission here is acting under § 1(14)(b) to regulate compensation to car line companies for the inter-line provision of mechanical protective service, and only indirectly to affect the inter-carrier division of protective service tariff revenues.

Nonetheless, we cannot blink reality. The car line is in most instances simply an adjunct of the parent carrier; this was Congress' governing premise in enacting § 1(14)(b). And the effect of requiring changes for the benefit of foreign car lines in the allocations made under Division Sheet 7 is to prescribe for the benefit of car-owning carriers with MPS units a readjustment of the division of past receipts from agreed joint rates for perishable freight. Thus, this case presents a tension between sections 15(6) and 1(14)(b), and it is the court's role to reconcile these provisions so as to reflect the underlying congressional intent. It is our sense that the distinctions between this case and *Brimstone* are differences which do not negate the pertinency of the principle underlying the Supreme Court's decision: that it is unfair to disrupt by readjustment of past receipts the expectations of a carrier who may have assented to a particular joint rate only because of the divisions it had been accorded. "The power to require readjustments for the past is drastic. It may reasonably exist in cases where the particular rate has been approved by the Commission after full hearing; it ought not to be extended so as to permit unreasonably harsh action without plain words." 276 U.S. at 122, 48 S.Ct. at 287, 72 L.Ed. at 494.

The *Brimstone* principle may bar liability for past non-compliance even though there has been prior administrative action here in the form of the 1962 Order requiring the superseding of all protective service contracts or arrangements, including Division Sheet 7. As this circuit stated in *Baltimore & Ohio,* the ICC's power to order adjust-

the general level of rates. "[M]ere general permission or suggestion concerning rates for all carriers, without consideration of the reasonableness of any particular rate, is not the 'finding or order' referred to by section 15(6)." 276 U.S. at 122, 48 S.Ct. at 287, 72 L.Ed. at 494.

**67.** Under *Atlantic Coast Line R.R. v. Delaware & H.R. Corp.,* 86 F.2d 721, 724 (2d Cir. 1966), even in the case of *prescribed* joint rates, the period of readjustment of divisions is restricted to the date of the complaint or order of investigation as to the reasonableness of the divisions,

rather than the date of institution of the earlier proceeding prescribing the rates.

**68.** The court intimated that there might be occasion for the exercise of its equitable judicial discretion in a case involving deliberate delaying tactics by the opposing carriers. 165 U.S. App.D.C. at 230, 506 F.2d at 1269.

**69.** *Atlantic Coast Line R.R. v. Delaware & H.R. Corp., supra* note 67; *Atlantic Coast Line R.R. v. Boston & M.R.R.,* 18 F.Supp. 886 (D.Mass. 1937).

ments of divisions as to agreed rates is prospective only, effective as of the date of an order or adjustment. Thus, the court declined to exercise its equitable power to circumvent this limitation by providing for the maintenance of reasonable divisions during the pendency of the administrative proceeding on the issue of the reasonableness of the divisions. 165 U.S.App.D.C. 230, 506 F.2d at 1269. Similarly, the administrative proceeding in this case remains pending. We do not have a culmination of the administrative process in the form of an order of prospective divisional adjustment, because no contracts or arrangements superseding Division Sheet 7 were filed with the ICC, at least until 1974. The Commission has yet to issue an order finding a particular submission not in compliance with the requirements of the 1962 Order and mandating a particular divisional adjustment.

### B. *Remand to the Commission*

⬛ We regard the problems of unfairness and the *Brimstone* principle as formidable, but we need not decide here whether they indeed bar liability for previous non-compliance with the 1962 Order, for the Commission has yet to state that such liability was in the contemplation of the 1962 Order. The 1962 Order by its own terms merely required the submission of superseding agreements, and there is a clear intimation in the report that further action by the Commission was contemplated as a predicate to liability for failure to supersede Division Sheet 7. In its conclud-

ing findings, the ICC warned that "[i]n the event new or superseding contracts are not filed, *further consideration will be given to the issuance of an order* finding the presently unapproved contracts not within the requirements of section 1(14)(b)." [70] This is made clearer in the Commission's 1972 responses to the referral from the California district court in the PFE enforcement action. Even though the 1972 declaratory order was premised on the facts as set forth in the California action and there is an express disclaimer as to general application, it is entitled to considerable weight, in our construction of the reach of the 1962 Order, as a recent statement of the ICC's views.[71] In the 1972 responses, the Commission stated that while the failure to file new, superseding sheets stated a violation of § 1(14)(b) and the 1962 Order, subjecting the non-complying carriers to ICC enforcement action, the order itself did not confer substantive rights upon the car lines to recover losses; liability for losses would arise, if at all, "from the contracts required by the Commission's order or by other means." [72] Although the disjunctive phrase, "or by other means," is ambiguous, the Commission's answer read in full suggests that it meant "or by administrative enforcement." [73] If this approach is adopted, and followed to its logical conclusion, the fact that superseding agreements were not filed and the Commission took no action to enforce its order would mean that there is no liability under the 1962 Order enabling car lines to recover for their losses incurred since passage of the June 10, 1963 deadline.

**70.** 318 I.C.C. at 127 (emphasis supplied). *See* note 36 *supra.*

**71.** *See Nelson, Inc. v. United States,* 355 U.S. 554, 558 n. 4, 78 S.Ct. 496, 499, 2 L.Ed.2d 484, 488 (1958) (the ICC may not modify its permits under the guise of interpretative action, but its "interpretation of the meaning of a permit, being simply a definitive declaration of what rights existed from the very beginning under the permit, cannot be equated with modification, however, unless found to be clearly erroneous"); *Locust Valley Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970) (declaratory order pursuant to referral, that plaintiffs were common carriers bound

to charge published rates rather than mere cartage operators, was not advisory, and district court erred in substituting its own findings).

**72.** *See* Answers H, I, J & K, 340 I.C.C. at 769–70.

**73.** 340 I.C.C. at 769:
J. is the Commission's 1962 Report and Order in Ex Parte No. 137 self-executing with respect to those intermediate and terminal carriers who refuse to enter into contracts with parties who have furnished mechanical protective service to them?

Because we regard the issue of liability for past non-compliance as material to our task of deciding whether the 1962 Order should be enjoined, or at least denied retrospective effect, we remand to the Commission,[74] for a determination as to whether under the terms of the 1962 Order carriers failing to file agreements superseding Division Sheet 7 can be held liable for the period between June 10, 1963, or some subsequent date,[75] and either date of ultimate compliance or ICC enforcement proceedings.

If it is the Commission's understanding that plaintiff carriers are liable for their previous non-compliance, then we will have to decide whether, and if so to what extent, considerations of equity[76] or the *Brimstone* decision bar such liability.

> *Answer:* The order is binding upon the carriers to comply therewith, and failure to do so subjects them to enforcement action by the Commission. Although the Commission's order requires the carriers to enter into contracts and prescribed certain terms to be included in those contracts, the order itself does not constitute a contract between the parties. In short, the Commission's order does not confer substantive rights upon the protective service companies to recover losses; that right must, if at all, arise from the contracts required by the Commission's order or by other means.

74. This statutory three-judge court has authority to remand for clarification of an ICC order where necessary to enable it to accomplish its reviewing tasks. *See, e. g., Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (inadequate justification for departure from prior ICC policy); *Chesapeake Motor Lines v. United States,* 153 F.Supp. 812 (D.Md. 1957) (failure to indicate underlying reason for change in definition of term in certificate).

Although the alternative of a referral of questions is available to this court under 28 U.S.C. § 1336(b), we do not wish to narrow the Commission's focus to specific queries. Rather, we prefer to make available the opportunity implicit in a remand to give fresh consideration to the matters in dispute here. *Cf. FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533, 44 U.S.L.W. 3413 (1976).

75. We note that even if the Commission determines that the carriers are liable under the 1962 Order, full liability commensurate with the period of non-compliance does not necessarily follow. The ICC has statutory authority to "suspend or modify its orders upon such notice and in such manner as it shall deem proper." 49 U.S.C. § 16(6). Equitable considerations may prompt the Commission to alter the effective date of the 1962 Order. "An agency, like a court, can undo what is wrongfully done by virtue of its order." *United Gas Improvement Co. v. Callery Properties,* 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284, 289 (1965). An agency has "the equitable power 'to regard as being done that which should have been done' by recreating the past, insofar as reasonably possible, to reflect compliance with the Act . . . ." *Plaquemines Oil & Gas Co. v. FPC,* 146 U.S.App.D.C. 287, 290–91 & n. 13, 450 F.2d 1334, 1337–38 & n. 13 (1971).

This process of equitable reconstitution of the past would involve a determination of where the equities lie—taking into account such matters as when plaintiff carriers should have become fully aware of the import of the 1962 Order and when they can be deemed to have breached their duty to negotiate in good faith agreements or arrangements superseding Division Sheet 7—and an appraisal of the availability of a mechanism for practicably restoring the full status quo ante. *See, e. g., Moss v. CAB,* 172 U.S.App.D.C. 198, 208–09, 521 F.2d 298, 308–09 (1975) (agency, in determining extent of recovery of unlawful fares, can pass on the "equity of restitution" in addition to the reasonableness of past rates, and in that case denied all recovery largely because of the absence of a fund of net unjust enrichment and lack of carrier willfulness in charging the unlawful fares); *Niagara Mohawk Power Co. v. FPC,* 126 U.S.App.D.C. 376, 380–83, 379 F.2d 153, 157–60 (1967) (agency has authority to assign effective date earlier than date of the issuance of the license, when project was maintained without license in violation of applicable law, in a discriminating manner that takes into account the willfulness of past noncompliance).

76. Equitable factors may bar all retroactive relief. *See, e. g., Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659, 758, 44 U.S.L.W. 4127, 4170 (U.S. Jan. 30, 1976) (recognizing de facto validity of past action of improperly constituted election commission and granting stay for 30 days—subsequently extended another 20 days—to permit it to function in the interim and allow Congress time to reconstitute the commission in conformance with the Constitution); *Blair v. Freeman,* 125 U.S.App.D.C. 207, 218, 370 F.2d 229, 240 (1966) (laches barring declaration of past invalidity but not injunction against future enforcement); *cf. Moss v. CAB, supra* note 75. Or they may work to limit the extent of liability for the past, to reflect the proper "equitable balance" between opposing considerations. *See, e. g., Zuber v. Allen,* 396 U.S. 168, 197, 90

There hovers over this case the question whether retrospective application of the 1962 Order is subject to attack because of the absence of Commission clarification—leading to a no man's land of private enforcement actions, with currents and cross-currents of decisions compounding confusion to a point nearer anarchy than law. The ICC's 1972 declaratory ruling said that the 1962 Order created no substantive rights of its own force. But the California district court in PFE's enforcement action, with the concurrence of a panel of the Ninth Circuit,

interpreted the "or by other means" phrase in the Commission's 1972 responses to endorse the availability of private actions for damages under sections 8 and 9 and for injunctive relief under section 16(12) of the Act, 49 U.S.C. §§ 8–9, 16(12),[77] for violations of the 1962 Order.[78] As to liability for damages, the district court held that PFE could recover under the Act, and on the basis of quantum meruit,

for damages occurring since January 1, 1964 [79]—essentially the difference between the amount plaintiff had been paid

S.Ct. 314, 330, 24 L.Ed.2d 345, 362 (1969); *Consumer Federation of America v. FPC,* 169 U.S. App.D.C. 116, 128, 515 F.2d 347, 359, *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975); *Indiana & Michigan Electric Co. v. F.P.C.,* 163 U.S.App.D.C. 334, 343–48, 502 F.2d 336, 345–50 (reh'g, 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975) (delaying effective date of new rates notwithstanding invalid agency suspension order with the effect of reducing utility's liability to make refunds); note 75 *supra* & cases cited therein.

A somewhat distinct but related approach is suggested by *National Ass'n of Indep. Tel. Producers & Distrib. v. FCC,* 502 F.2d 249 (1974), where the Second Circuit, per Judge Hays, extended the effective date for the FCC's amendment of its prime time access rule because the agency had failed to allow adequate time for network adjustment to the new rule.

**77.** These provisions provide:

§ 8 Liability in damages to persons injured by violation of Law

In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

§ 9 Remedies of persons damaged; election; witnesses

Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable

under the provisions of this chapter in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. In any such action brought for the recovery of damages the court before which the same shall be pending may compel any director, officer, receiver, trustee, or agent of the corporation or company defendant in such suit to attend, appear, and testify in such case, and may compel the production of the books and papers of such corporation or company party to any such suit. *As amended,* Pub.L. 91–452, 84 Stat. 931, § 243(a) (Oct. 15, 1970).

§ 16 par. (12). Proceedings to enforce orders other than for payment of money. If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney General, may apply to any district court of the United States of competent jurisdiction for the enforcement of such order. If, after hearing, such court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, such court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

**78.** *Pacific Fruit Exp. Co. v. Akron, Canton & Youngstown R. Co.,* 355 F.Supp. 700, 707–709 (N.D.Cal.1973), *aff'd,* 524 F.2d 1025 (1975). The court also cited § 16(7) of the Act, 49 U.S.C. § 16(7), which simply provides that "[i]t shall be the duty of every common carrier . . . to observe and comply with [ICC] orders so long as the same shall remain in effect."

**79.** The court gave no reason for setting the liability period as of this date rather than June

under said Division Sheet 7 arrangement, or otherwise, and the amount which plaintiff would have recovered if said defendants had complied with said order by contract with plaintiff, or among themselves for plaintiff's express benefit, as required by said I.C.C. order of August 27, 1962—together with interest, attorney's fee and cost of suit.

Other courts, in actions between carriers, have taken the view that Division Sheet 7 as an inter-carrier agreement falls outside the purview of § 1(14)(b), and the failure to file the sheet with the ICC for approval states no violation of the Act. Under the reasoning of these decisions, car lines may not be able to predicate recovery on the carriers' failure to file agreements superseding the sheet.[80] Moreover, there are several other car line actions for damages, which have been stayed pending our decision here,[81] and more are likely to follow.

While one could analytically diagram the present action, to enjoin enforcement of the 1962 order as invalid, as entirely separate from possible private actions to enforce it, and hence to interpret it, in the real world the underlying considerations interrelate. If the 1962 Order is intended for private enforcement—or if the ICC is chargeable with being aware that it was appropriate for enforcement by private actions—greater precision and clarity may rightfully be demanded. With an order left unnecessarily uncertain there is a danger of inconsistent determinations, as to obligations of connecting carriers to make up the past losses of foreign car lines, and an attendant incentive to engage in forum-shopping. There is also the prospect of a serious distortion of inter-carrier divisions of joint perishable freight rates. This may well be the consequence if, as we fear, the California district court (and others that may follow its lead)

has no judicially manageable way to determine what a car line would have received had there been a timely compliance with the 1962 Order, and to allocate intelligently a car line's losses among all the railroads over whose lines its mechanical refrigeration units traverse.

■ The Act contemplates private enforcement, but the breadth of sections 8 and 9 cannot be read to disturb the design of Congress to commit vindication of some statutory policies to the exclusive stewardship of the ICC. The Third Circuit has held that responsibility for enforcing the provisions of § 5 of the Act, 49 U.S.C. § 5, governing control of acquisitions involving carriers, is vested exclusively with the Commission.[82] The opinion in *Baltimore & Ohio,* by Judge Wilkey of the District of Columbia Circuit, makes clear that the ICC has exclusive jurisdiction under § 15(6) to determine what is a proper division of joint rates among carriers, the matter thus falling outside the reach of judicial power in the first instance and the relief ultimately obtainable in the courts shaped by the statutory restrictions on the ICC's power. The court specifically rejected the argument that an independent judicial role could be carved out of the private actions authorized by sections 8 and 9, the statutory obligation under section 1(4) of the Act, 49 U.S.C. § 1(4), to establish "just, reasonable and equitable divisions" of joint rates, or the Act's preservation of consistent common law in section 22, *id.* § 22. "Insofar as there is a statutory obligation to provide reasonable divisions and rates, the statutory framework and context define a duty as implemented by orders of the ICC, a duty which is necessarily prospective in the case of agreed rates." 165 U.S.App.D.C. at 231, 506 F.2d at 1270.[83]

10, 1963, the deadline the ICC had set for the filing of superseding agreements.

80. *See* text fat pp. 1140–1141 & note 49 *supra.* We note that two of the courts seem to have distinguished the California action on the ground that plaintiff there was a car line company rather than a carrier. *See* note 50 *supra.*

81. *See* note 27 *supra.*

82. *B. F. Goodrich Co. v. Northwest Indus., Inc.,* 424 F.2d 1349, *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

83. This view of § 15(6)'s effect on judicial remedies commands the support of the Second Circuit and other courts. *Atlantic Coast Line R.R. v. Delaware & H.R. Corp.,* 86 F.2d 721 (2d Cir. 1936); *Beaumont S.L. & W. Ry. Co. v.*

The rationale of *Baltimore & Ohio* would seem to apply with equal force to the carriers' obligations under § 1(14)(b), as delineated in the 1962 Order, to submit agreements superseding Division Sheet 7. As noted above, the reality of the instant controversy between foreign car lines and non-originating carriers is an attempt on the part of car-owning carries with MPS units to seek an adjustment of the division of revenues set forth in the sheet. In our view, the commands of the 1962 Order insofar as they implicate inter-line divisions of freight rates would seem enforceable only by the Commission.[84] And the question of readjustment of past receipts under Division Sheet 7, colored as it is ·by the *Brimstone* reading of § 15(6), would seem foreclosed if it is the Commission's view that because of the failure to file superseding, approved agreements and its tardigrade pace in enforcement carriers are under no substantive liability for past non-compliance.

We recognize that neither the mandate of this three-judge court nor the precedent in the District of Columbia Circuit extends as controlling authority to other circuits. But the doctrine of primary jurisdiction would seem to provide a similar answer to the problem of private enforcement actions predicated on an interpretation of the reach of the 1962 Order inconsistent with the ICC's reading of its own order.

▪ The doctrine states a principle of accommodation of the respective rules of agency and court, to ensure primacy for the expert body established by Congress to oversee the implementation of regulatory policy and nationwide uniformity in the application of that policy. As developed in railroad rate reparation cases, beginning with *Texas & P. R. R. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), the Supreme Court has made clear that the private enforcement provisions of the Act require initial resort to the ICC on primary jurisdiction issues. In *ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 109, 114 (1966), the Court stated that in reparation actions under sections 8 and 9 "the primary jurisdiction doctrine requires initial submission to the Commission of questions that raise 'issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by [the] Act.'"[85] And the Commission's determinations with respect to such issues, whether rendered in the course of a referral from a direct action under sections 8 and 9 or on a shipper's complaint

*United States*, 36 F.2d 789 (W.D.Mo.1929), aff'd, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221 (1930); *Atlantic Coast Line R. Co. v. Boston & M.R. Co.*, 18 F.Supp. 886 (D.Mass.1937). *Cf. Backus-Brooks Co. v. Northern Pac. R. Co.*, 21 F.2d 4, 15–16 (8th Cir.), cert. denied, 275 U.S. 562, 48 S.Ct. 120, 72 L.Ed. 427 (1927) (dismissed suit for prospective relief and past damages from alleged unreasonable division because this was a matter for the ICC to determine in the first instance, but in dictum stated if the division was found unreasonable there was judicial power to "grant relief for past wrongs."). *Contra, Atlantic Coast Line R.R. v. Baltimore & Ohio R.R.*, 12 F.Supp. 711 (D.Md. 1935); *Atlantic Coast Line R.R. v. Pennsylvania R.R.*, 12 F.Supp. 720 (E.D.Pa.1935).

received under Division Sheet 7 "must first be brought before the [Commission] before court review is obtainable." However, the court suggested that a violation of § 1(14)(b) would nonetheless be judicially cognizable under sections 8 and 9, but found no violation in the failure to submit Division Sheet 7 for approval because it was an inter-carrier agreement. We reject this view of Division Sheet 7's exemption from the command of § 1(14)(b), *see* text at pp. 1140 & 1141 *supra*. Moreover, we cannot understand the court's premise that the commitment to the ICC of exclusive jurisdiction over inter-carrier division of revenues is to be ignored because another section of the Act may be implicated in the failure to submit the division sheet for approval under § 1(14)(b).

**84.** The court in *Chicago & N.W. Transp. Co. v. Atchison, T. & S.F. Ry. Co.*, 367 F.Supp. 801, 807–08 (N.D.Ill.1973), recognized that under § 15(6) an originating carrier's counterclaim to recover expenses incurred in providing mechanical protective service exceeding payments

**85.** *Quoting United States v. Western Pac. R. Co.*, 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132 (1956), and *citing Texas & Pac. R. Co. v. American Tie & Timber Co.*, 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255 (1914).

before the Commission leading to a reparation award,[86] would be given "conclusive effect," subject to judicial scrutiny for abuse of power and presence of adequate findings based on substantial evidence. *See* 383 U.S. at 593–94, 86 S.Ct. at 1010–11, 16 L.Ed.2d at 122.

Primary jurisdiction is ordinarily invoked for factual issues and matters clearly falling within the ICC's discretion, such as the reasonableness of past or present rates, but the underlying principles of deference to agency expertise and maintenance of uniformity in matters of national transportation policy would seem equally applicable when the issue is one of construction of the reach of a previous ICC order. The Commission's analysis of the intendment and consequences of its order, if not clearly erroneous, must be given weight by the court.[87] Furthermore, the principles underlying primary jurisdiction would seem to require that weight be given to the Commission's views on the equity of restitution for the benefit of foreign car lines.[88] The Commission is not "without power to inquire whether injustice has been done and make report accordingly." *Atlantic Coast Line v. Florida*, 295 U.S. 301, 312, 55 S.Ct. 713, 718, 79 L.Ed. 1451, 1459 (1935). "The principles of equity are not to be isolated as a special province of the courts. They are rather to be welcomed as reflecting fundamental principles of justice that properly enlighten administrative agencies under

law. The courts may not rightly treat administrative agencies as alien intruders poaching on the court's private preserves of justice." *Niagara Mohawk Power Corp. v. FPC*, 126 U.S.App.D.C. 376, 383, 379 F.2d 153, 160 (1967).[89] And this is particularly the case where liability for past non-compliance not only implicates a possible statutory barrier in § 15(6) but also may have impact on the present solvency of the carriers, triggering the very concerns that led Congress to establish the ICC. As the court recently stated in *Moss v. CAB*, 172 U.S.App.D.C. 198, 208–09, 521 F.2d 298, 308–09 (1975), "[t]he equitable aspects of refunding past rates are inextricably entwined with the Board's normal regulatory responsibility, as such refunds may substantially affect the future rates, performance, and health of the industry. The statutory scheme thus seems to require that the Board pass in the first instance not only on the reasonableness of past rates, but on the equity of any recovery where such rates are found to have been unreasonable." [90]

### C. Remand Proceedings May Include Settlement Conference

As part of the proceedings on remand, we urge the Commission in light of the protracted history of this litigation, and the problems presented by the availability of private enforcement actions, to inquire into the possibility of holding a settlement conference among all interested carriers

---

**86.** Judicial review of a reparation award would obtain either in the course of a suit to enforce the award under § 16(2) or one to set it aside under § 17(9), 49 U.S.C. §§ 16(2), 17(9). *See generally ICC v. Atlantic Coast Line R. Co., supra,* 383 U.S. at 580–85, 86 S.Ct. at 1004–1006, 16 L.Ed.2d at 114–117.

**87.** *See* note 71 *supra* & cases cited therein.

**88.** This involves awareness of the extent of injustice to one side or the other, and the relative weight, so to speak, of the injustices and burdens. To the extent that restitution, or quantum meruit, depends on or is influenced by considerations of "cost" of rendering the service, the courts would in all likelihood have to depend on the ICC for informed and uniform approach to such matters as the extent to which the car line's losses were attributable to the provisions of MPS units, and the proper

allocation of such among carriers participating in the shipments.

**89.** *See* discussion in note 75 *supra.*

**90.** The court in *Moss* noted that whereas the Federal Aviation Act does not provide any express right to recover for unlawful airline rates, the Interstate Commerce Act imposed a liability on rail carriers, enforceable either before the ICC or in district court, for unjust, unreasonable rates, the standard of recovery being "justness and reasonableness, a matter within the Commission's primary jurisdiction." 172 U.S.App.D.C. at 204, 521 F.2d at 304. We do not take this as holding that the ICC is without authority to consider the equity of restitution in cases seeking reparation of unlawful rates or for recovery of losses due to violations of § 1(14)(b).

and car lines companies. Such a conference need not be, and probably should not be, restricted to those formally party to this lawsuit. We note that some of the plaintiffs and all the original intervening plaintiffs have already resolved their differences with defendants and intervening defendant.[91] A settlement proceeding would further not only the interests of judicial administration but also strike a more considered balance of the opposing interests and more effective vindication of statutory policies than continued litigation.[92]

D. *The Propriety of an Injunction Pending Outcome of Remand*

 In the spirit of the Supreme Court's decision in *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), we decline to issue an injunction suspending the operation of the 1962 Order pending the outcome of our remand to the Commission. While we are empowered to do so under 28 U.S.C. § 2324,[93] that power should not be exercised so as to substantially interfere with the function of the Commission. As the *Atchison, Topeka* decision noted, "the issuance of an injunction pending further administrative action may indicate what the court believes is permitted by national transportation policy, prior to an expression by the Commission of its view. This is precisely what the doctrine of primary jurisdiction is designed to avoid." 412 U.S. at 821, 93 S.Ct. at 2382, 37 L.Ed.2d at 370.[94] In the absence of the Commission's views on the reach of the 1962 Order as to plaintiff carriers' liability for previous noncompliance, we think it premature for this court to consider, measure or appraise "substantial doubt about the consistency of the Commission's action with its mandate from Congress." *Id.* at 822, 93 S.Ct. at 2382, 37 L.Ed.2d at 371.[95] In our view, the circumstances of this case present a compelling occasion for invocation of the primary jurisdiction doctrine, to bring to bear on this protracted, entangled controversy the expertise and amelioratory processes of the Commission unencumbered by court injunction.

Although we issue no injunction, our order of remand for further proceedings not inconsistent with our opinion also calls on the Commission to report to this court within 90 days on the progress of its proceedings on remand.

## ORDER

The Court having considered the memoranda and arguments of counsel for plain-

---

**91.** *See* note 2 *supra.*

**92.** A settlement need not be all-inclusive and could reserve certain issues for litigation. *See, e. g., City of Chicago v. FPC*, 128 U.S.App.D.C. 107, 385 F.2d 629 (1967), *cert. denied*, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

**93.** *See* note 1 *supra* for text.

**94.** Although the Court in *Atchison, Topeka* stated that the district court had power to suspend operation of the ICC order approving separate charges for in-transit grain inspections pending final determination of the shippers' challenge, but lacked authority, where the agency's error was inadequate justification for departure from precedent, to enjoin carriers from implementing new rates embodying the inspection charge, 412 U.S. at 818, 93 S.Ct. at 2380, 37 L.Ed.2d at 368, the Court's discussion of the applicability of primary jurisdiction was not carried forward in terms of this distinction. Rather, the Court spoke broadly of the impor-

tance of avoiding issuance of an injunction undercutting considerations of primary jurisdiction when a case is remanded solely for elaboration of the agency's policies.

**95.** We note that irreparable harm will not result if an injunction does not issue and the carriers ultimately prevail as to their retrospective liability. The carriers are not during the pendency of this proceeding compensating the car lines for their past losses in excess of the payments provided in Division Sheet 7. Pending private enforcement actions have been stayed until the resolution of this case. *See* note 27 *supra.* The California district court has yet to rule on the quantum of damages for past non-compliance. Although that court also enjoined the carriers to proceed forthwith to enter into good faith negotiations with PFE toward agreement on new superseding contracts with PFE, this is consistent with our determination in parts I–VII of this opinion as to the validity of prospective application of the 1962 Order.

tiffs, defendants and intervening defendant Pacific Fruit Express Company, it is this *6th* day of April, 1976,

ORDERED that intervening defendant's motion to dismiss plaintiffs' complaint on the ground of the doctrine of laches is hereby denied; it is

FURTHER ORDERED that motion of Western Maryland Railway Company for leave to file second amended complaint as intervening plaintiff is denied, without prejudice to any motion it might wish to make in proceedings before the defendant Interstate Commerce Commission; and it is

FURTHER ORDERED that the complaint of plaintiffs to suspend, enjoin, annul and set aside the report and order of the defendant Interstate Commerce Commission in Ex Parte No. 137, Contracts for Protective Services, 318 I.C.C. 111, decided August 27, 1962, is dismissed as to prospective application from the date of this judgment; and it is

FURTHER ORDERED that the record in Ex Parte No. 137 be remanded to the defendant Interstate Commerce Commission for a determination and proceedings not inconsistent with the opinion accompanying this judgment; and it is

FURTHER ORDERED that defendant Interstate Commerce Commission report to this Court within 90 days on the progress of its proceedings on remand; and it is

FURTHER ORDERED that this Court will retain jurisdiction of this case in order to consider whether any changes in this order might be deemed appropriate in light of the results of the proceedings on remand.